NO.  23-2557

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

---

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

vs.

LARRY JONES,
Defendant-Appellant.

---

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:20 cr 00309-1

Honorable. Virginia M. Kendall, Judge Presiding.

---

OPENING BRIEF, ARGUMENT AND REQUIRED APPENDIX FOR
LARRY JONES DEFENDANT-APPELLANT

---

ALLAN A. ACKERMAN
Attorney at Law
Counsel of Record
19 S. LaSalle Street, Suite 502
Chicago, Illinois  60603
Telephone:  312- 332-2891
Facsimile:   312-750-1595
Email: profaaa@aol.com

Counsel for Larry Jones
Defendant-Appellant

---

ORAL ARGUMENT REQUESTED

---

Save As        Clear Form

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 23-2557

Short Caption: United States v. Larry Jones

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[✓] **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Larry Jones

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Phillip Turner, Law Offices of Phillip A. Turner and Debra Loevy, Loevy & Loevy

(3)    If the party, amicus or intervenor is a corporation:

i)    Identify all its parent corporations, if any; and

N/A

ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: s/Allan A. Ackerman                    Date: March 22, 2024

Attorney's Printed Name: Allan A. Ackerman

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes [✓]    No [ ]

Address: 19 S. LaSalle Street, Suite 502, Chicago, IL 60603

Phone Number: 312/332-2891                    Fax Number: 312/750-1595

E-Mail Address: profaaa@aol.com

rev. 12/19 AK

i

## TABLE OF CONTENTS

Circuit Rule 26.1 Disclosure Statement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii-iv

     CASES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iii

     STATUTES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iv

     OTHER AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iv

JURISDICTIONAL STATEMENT  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1-2

ISSUES PRESENTED FOR REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2-32

SUMMARY OF THE ARGUMENT  . . . . . . . . . . . . . . . . . . . . . . . . . . . .  32-33

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  33-45

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  33-34

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

CERTIFICATE OF COMPLIANCE WITH FRAP 32(a)(7)

CIRCUIT RULE 30 STATEMENT

CERTIFICATE OF SERVICE

REQUIRED APPENDIX

## TABLE OF AUTHORITIES

### CASES

I.     Whether the District Court Erred by Including as Uncharged Relevant Conduct Drug Amounts and Violent Acts from a Time Period Distinct from that Appearing in Defendant's Drug Trafficking/Money Laundering Indictment?  . . 34

Gall v. U.S., 552 U.S. 38 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33-34

Hurtado v. California, 110 U.S. 516 (1884). . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

U.S. v. Bacallao, 149 F.3d 717 (7th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . 34

U.S. v. Bell, 808 F.3d 926 (D.C. Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

U.S. v. Berry, 553 F.3d 273 (3d Cir.2009). . . . . . . . . . . . . . . . . . . . . . . . . . . 44-45

U.S. v. Brasher, 105 F.4th 1002 (7th Cir. 2024) . . . . . . . . . . . . . . . . . . . . . . . 40-42

U.S. v. Crockett, 82 F.3d 722 (7th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . 42, 44

U.S. v. Draheim/Lewis, 958 F.3d 651 (7th Cir. 2020) . . . . . . . . . . . . . . . . . . . . . 42

U.S. v. Duarte, 950 F.2d 1255 (7th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . 35

U.S. v. England, 555 F.3d 616 (7th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . 44-45

U.S. v. Hahn, 960 F.2d 903 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

U.S. v. Mendoza, 510 F.3d 749 (7th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . 34

U.S. v. McGowan, 478 F.3d 800 (7th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . 41

U.S. v. Mullins, 971 F.2d 1138 (4th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . 41

U.S. v. Ortiz, 431 F.3d 1035 (7th Cir. 2005). . . . . . . . . . . . . . . . . . 35-36, 41-42, 44

U.S. v. Patel, 131 F.3d 1195 (7th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . 42

U.S. v. Purham, 754 F.3d 411 (7th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . 42

U.S. v. Rollerson, 7 F.4th 565 (7th Cir. 2021) . . . . . . . . . . . . . . . . . . . . . . . . 34, 44

U.S. v. Young, 863 F.3d 685 (7th Cir. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . 33-34

## CONSTITUTION, STATUTES AND RULES

U.S. Constitution Fifth Amendment – Due Process . . . . . . . . . . . . . . . . . . . . . 34, 44

18 U.S.C. § 710. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

18 U.S.C. § 1956(a)(3)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. § 3231 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 3553. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 8, 26

18 U.S.C. § 3742 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

21 U.S.C. § 841(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

21 U.S.C. § 846. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

U.S.S.G. § 1B1.3 and 1B1.3(a)(1)(A) and §§ 1B1.3(a)(2), (3) . . . . . . . . . . . . 42, 44

U.S.S.G. § 2D1.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 24, 39

## RULES

Seventh Circuit Rules 30(a) and 30(b). . . . . . . . . . . . . . . . . . . . . . Preceding Appendix

## OTHER AUTHORITIES

## JURISDICTIONAL STATEMENT

On July 24, 2020, Larry Jones (a/k/a "Lil Larry," hereafter defendant or Jones), and two others, were charged by the Special January 2019 Grand Jury (in Chicago) in an nine (9) count indictment. R. 1. Those counts charged that Jones, from about August 6, 2018 and continuing until about September 3, 2019, conspired to violate federal drug and money laundering statutes in violation of 21 U.S.C. §§ 841(a)(1) and 846. In Count 3 Jones was charged with money laundering under 18 U.S.C. § 1956(a)(3)(A) based on August 6, 2018 activities. Each counts involved drug activity in the Chicago area between August 2018 and September 2019. R. 1. App. 1-12.

On January 19, 2023, Jones, who had been released pending trial and was represented by retained counsel, executed a plea agreement. R. 174. App. 14-33. Based on his plea agreement, Jones pled guilty to Counts 1 and 3 of Indictment 20 CR 309 before the Honorable Virginia M. Kendall. Judge Kendall accepted defendant's guilty plea. R. 173.[1]

On July 20, 2023, following several hours of sentencing evidentiary hearings, Jones was sentenced to 188-months on Count One and a concurrent 188-month sentence on Count Three (along with a four-year term of supervised release and a monetary forfeiture order). The balance of the counts against Jones were

---

[1]  The District Court's docket filings are designated as "R. —," and the January 19, 2023, July 19-20, 2023, guilty plea and sentencing Reports of Proceedings will be referred to by the date of the proceedings followed by "Tr. ___."

dismissed. R. 205-206.

Jones filed his original *pro se* Notice of Appeal on August 4, 2023. Subsequently, the district court allowed counsel's motion to amend/correct his Notice of Appeal *Nunc Pro Tunc* to August 4, 2023. R. 210, 225-226.

The district court had jurisdiction pursuant to 18 U.S.C. § 3231 and the United State's Court of Appeals for the Seventh Circuit has jurisdiction based on 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

## ISSUE PRESENTED FOR REVIEW

**I.    Whether the District Court Erred by Including as Uncharged Relevant Conduct Drug Amounts and Violent Acts from a Time Period Distinct from that Appearing in Defendant's Drug Trafficking/Money Laundering Indictment?**

## STATEMENT OF THE CASE

Larry Jones, a/k/a "Lil Larry," with counsel, appeared before presiding Judge Kendall during the morning of January 19, 2023, for his "change-of-plea" concerning Counts 1 and 3 in 20 CR 309-1.

AUSA Arce appeared for the government and the court is advised that there was a 20-page plea agreement. Under oath, Jones relates that he is 42 years old, went to the 10th grade in high school and is reasonably healthy with no history of treatment for mental health difficulties. He discussed the case and the plea

agreement with his attorney and is satisfied with the attorney's representation; he has had enough time to review the plea agreement and doesn't need any further time because they have discussed it many, many times. Neither the government nor defendant's attorney, Philip A. Turner have any questions concerning his competency. Tr. 2-5 (for the balance of this segment of the Statement of the Case the report of proceeding pages are from 1/19/23).

The court reviewed the nine-count indictment with Jones; in Count One he's charged with possessing heroin with the intent to distribute more than 100 grams and in Count Three he's charged with money laundering. And, in Counts 2, 4-9, he is charged with distributing quantities of heroin. Tr. 5-6. The court then reviewed the plea agreement explaining the maximum and minimum penalties regarding Count One and Three. The court inquired of the defendant concerning her explanations and the defendant answered he understood. Tr. 6-7.

Starting at Tr. 8-9 the court discussed "relevant conduct," noting that the government, using the 2021 U.S.S.G. manual, maintains that Jones is responsible for 85 grams of cocaine base which converts to 303.54 kilos of converted drug weight. Further, they have 160-200 grams of fentanyl which is the equivalent of 400-500 kilos of drug weight. Furthermore, according to the government there is 5.57-6.04 kilos of heroin which is converted to 5,570-6,040 kilos of converted drug weight. Finally, there is 12.71 kilos of marijuana and the combined and converted drug weight makes Jones responsible [per relevant conduct] of between 6,286.25-6,856.25 kilos of converted drug weight. That gives rise to an offense

level of 32 because it's between 3,000 and 10,000 kilos of converted drug weight. Per the plea agreement, defense counsel disagrees and will argue or reserves the right to argue at the time of sentencing that a different drug weight applies. Concerning the two-level increase because Jones was a leader, organizer, manager or supervisor will be just explained by defense counsel. *Id.* at 9-10.

The court summarized the potential guideline range and, with acceptance of responsibility, it becomes a level 33. Because his prior convictions are beyond the 15-year period they are not calibrated as criminal history points.

Defendant's plea agreement has a level 36 rather than a level 33 and in response to questions from the court, government counsel maintains that they may argue at sentencing that Jones has not accepted responsibility and therefore the offense level should be 36 and not 33. *Id.* at 11-12.

The court then reminds defendant that the guideline calculations being discussed are preliminary and the court will make the determination of the correct guideline calculations. However, at a level 36 with a criminal history of 1, his guideline range is 188-235 months. *Id.* at ¶ 12. And, he will not be permitted to withdraw his guilty plea if the U.S. Probation Officer has different calculations. Defendant agrees. *Id.* at Tr. 12-13.

The defendant agrees that he's giving up his rights to a jury trial and all his trial rights, and defendant will have the right to appeal this guilty plea and the sentence that I impose. Jones understands and agrees. Tr. 14-16.

After the government articulated its factual basis for Counts One and Three at Tr. 17-21, the court asks defendant if he agrees–he did not. Per Jones, he admits he did wrong and did what he did but it's the amounts that they're saying. *Id.* at Tr. 21. In other words, Jones disagrees with the relevant conduct aspect of the government's factual basis. With that the court advises defense counsel and Jones that she will not accept his guilty plea and he should have another conversation with his lawyer. Tr. 21-23.

After speaking with Jones, defense counsel explained some of the difficulties Jones has in understanding words like "advisory" and things of that sort; he just misunderstood and he'll tell the court that. According to defense counsel Jones now understands what is meant by "factual basis" and defense counsel believes that Jones will tell the court that he agrees with the government's factual basis. Thereafter Jones agrees that it was the amounts in the other portion "relevant conduct," not the amounts in the factual basis. *Id.* at Tr. 25-26.

Thereafter, defendant agrees with the drugs that were distributed on August 6 and October 24, 2018 and he agrees to having received $9,385 for those transactions. He further agrees that on August 6 he got $3,750 and $1,875 was repayment to him for the drugs previously given the confidential source. With that, defendant agrees that he was disagreeing with the amount of drugs that were mentioned as far as the base offense level. The court then accepted his guilty plea to Counts One and Three. *Id.* at Tr. 25-29.

Jones, through counsel, requested that he be released pending sentencing.
The court listened to the arguments of counsel and denied release pending
sentencing.

**July 19, 2023** – First evidentiary hearing sentencing date before the
Honorable [now Chief Judge] Virginia M. Kendall. Larry Jones is represented by
retained counsel, Philip A. Turner, and attorneys appearing for the government are
Jimmy L. Arce and John D. Mitchell.

Before getting to the guidelines, the court discusses the PSR and
defendant's plea agreement. Without objection from the from the government, the
court agrees to remove ¶ 17 and 18 from the PSR. ROP 7/19/23 at Tr. 5. The
government opposes acceptance of responsibility and removing ¶ 10 from the
PSR. *Id.* at Tr. 6-7.

After discussing defendant's plea agreement and his guilty plea to Counts
One and Three, the court explains how advisory guidelines operate and the § 3553
factors that are considered by the court for sentencing purposes after completing
the federal sentencing guideline calculations. Concerning relevant conduct, the
court goes through the relevant conduct and how what was actually sold as part of
the drug conspiracy has converted drug weight for guideline calculation purposes.
*Id.* at Tr. 8-9. Based on those calculations and the possible two-level increase as a
leader or manager, that brings the base offense level for Count 1 to a level 34.
Then you add to that BOL (34) the money laundering count, and you add two
more levels bringing it to a BOL of 36. Then with grouping it still remains a level

6

36 and if you receive 3 levels off or acceptance of responsibility you're at a level 33 and because you don't have any criminal history points it's either going to be a level 36 (no acceptance of responsibility) or a level 33 (acceptance of responsibility). According to the court a level 36, with no criminal history, reaches an advisory guideline range of 188-235 months. Your attorney is going to argue for less than that based on the drug quantity, along with your acceptance of responsibility. The court also explains that the calculations are preliminary and they could be higher or lower and it will be the judge who makes the calculations under the guidelines. The defendant answers that he understands what the court has said. *Id.* at Tr. 10-13.

Starting at Tr. 17, the government recites its factual basis for Count One. In part, the government explained that from approximately August 2018 through December 2019, defendant worked with Ms. Fountain and Mr. Spencer and others concerning the possession and distribution of heroin and the monies collected for that heroin. The government goes through specific dates such as August 6, 2018 and as part of his plea agreement Jones acknowledged being involved in drug transactions on specific dates in August, September and December 2018 and February 2019. The government also recited the factual basis for the money laundering–Count 3 which was also acknowledged as part of the plea agreement. *Id.* at Tr. 17-21.

Concerning relevant conduct, the defense position is the drug amounts are overstated and the PSR's reference at ¶ 11 is objectionable. No matter. The court

7

withholds judgment concerning that relevant conduct dispute. *Id.* at Tr. 7-9. The court accepts the rest of the PSR and commences discussing offense levels.

The defense maintains defendant's offense level is 24, the PSR has 32 as the offense level. Defendant admitted 174 grams of heroin and under § 2D1.1 that's a level 24, which defense counsel increases by two levels because of money laundering; so it's a level 26 and subtracting the acceptance of responsibility there is a U.S.S.G. level of 23 with an advisory sentencing range of 70-87 months. *Id.* at Tr. 10-11. The government forcefully disputes the defense guideline positions, contending that the defense is mistaken. *Id.* at Tr. 13-14. The sentencing court eschews making the U.S.S.G. calculations while agreeing that it has to be done before considering § 3553 factors.

In advance of Spencer's testimony, defense counsel has discovery issues concerning the contemplated testimony from Messrs. Spencer and Dockett. The sentencing court resolves those disputes. Tr. 24-28.

- On 7/19/23, the government called its first sentencing evidentiary witness, Jamar Spencer (Spencer). At age 37, he grew up on the westside of Chicago. He went to the 10th grade at Austin High School and was "kicked out." His criminal history includes several felony convictions and his plea agreement is contained in the record at R. 118. After serving several Illinois felony sentences, as part of his plea agreement, he pled guilty to drug trafficking offenses and stipulated to a pending federal indictment involving a firearm. Tr. 30-32. In this case, along with Marsha [Fountain] and defendant, he agreed to provide truthful

8

testimony as part of his plea agreement. Tr. 33-34.

He joined the Black P Stone gang in the Austin area of Chicago when he was 15 and at Austin High School. They would have occasional meetings, talk about the neighborhood and the gang had different ranks. He believed there was a "Prince," and an "Akbar," and they had status as higher-ups in the "Stones." In the Stone's rankings, a "General" was below a Prince and then a "Mufti," and below that, a "Ranger." He was a Ranger and to become a General you had to do some work, whatever the organization tells you to do including "to kill somebody." Tr. 37-38. The meetings were periodic, more than once a year, he would see Jones at the meetings and by word of mouth he learned that Jones was a "General." He was 18 when he first met Jones and he never saw Jones do anything but knew that he had gone to jail (went away) for attempted murder. And after looking at a government photo, he recognizes Dante Dockett from the neighborhood; Dockett was one of the Vice Lords. Dockett and Jones hung around together; by word of mouth he learned that Dockett was a "shooter" and that Jones and Dockett did drug work together. Tr. 41-44.

Spencer identified another Vice Lord "Breezy" Montana; Jones had a relationship with Montana. If Jones had a problem, he had Montana who was like a "send-off" man. Per Spencer the "send-off" man would do whatever he was told to do including kill somebody. *Id.* at Tr. 45.

Spencer testified that between October 2015 and 2020 he did drug deals with others and Jones was one of his suppliers. Spencer could not recall how much

marijuana Jones supplied during that time frame. Tr. 47. But his plea agreement includes over 12 kilos, along with heroin (about 5 kilos) and about 100 grams of fentanyl-laced heroin and about 85 grams of crack [cocaine]. Tr. 48-49.

Spencer was paroled out of the IDOC around August 2016 and he started dealing heroin with Jones around October 2016.[2]

Concerning getting marijuana from Jones, in the beginning it was a few ounces, and into 2017 he got up to a pound of marijuana. Spencer sold it out of a gas station in the Austin neighborhood which was an area controlled by the "Stones." Per Spencer, around May 2017 he was getting small quantities of heroin from Jones which he was selling "off my phone," in the Austin area. Jones would personally bring him drugs from time to time. Tr. 52-55.

During May 2018 he got a call from one of his marijuana customers. He met up with the customer who pointed a gun at him, and then that customer called others and Spencer was taken from place to place and ended up on the north west side where his family lived. At gunpoint he was taken into the apartment because they were going to rob him or steal money from the apartment. Everyone in the apartment was tied up and he escaped because he heard one of the kidnappers say they were going to kill Spencer and his brother. Spencer jumped out a window from the second floor, landed on a metal gate broke his shoulder and leg and

---

[2]  Defense counsel made repeated objections because Spencer referred to his plea agreement and had little independent recollection without looking at his plea agreement or being reminded about the content of his plea agreement. Tr. 45-46, 51-52.

ended up having several surgeries. He didn't do any further drug dealing until around October 2018. Tr. 56-60.

During October 2018 he met up with Jones and agreed that Jones would supply Spencer with heroin. Spencer had another supplier or another person he was dealing with and they would get 25 grams at a time, sometimes on credit, sometimes not. On 10/24/18, Jones told him to get a certain amount of money after delivering some heroin. He gave the money to Jones but did not know that the drug customer was an informant. Spencer saw and listened to an audio/video of the sale. Tr. 60-62. During October 2018 Spencer claimed that Jones directed him to different drug spots to sell drugs at certain locations. And that continued into 2019. Tr. 63-66.

Spencer's testimony included discussing his co-indictee, Marsha Fountain (Marsha). Spencer met her during late 2018. She knew how to mix heroin, Jones was present at an apartment around Monroe and Central when she would mix heroin with another woman. Marsha related that she had people and she could get whatever she needed when she was mixing heroin. She would mix it with dormins and fentanyl, weigh it, put it in a blender and mix it up; Spencer and Jones would be present and he was living in that apartment at the time. After Marsha mixed the drugs, they would package it and Jones would tell them where to take it and what to do with it. Spencer would collect money, he would give it to Marsha

11

occasionally but most of the time to Jones. Tr. 68-70.[3]

Spencer testified concerning a December 2016 double murder that occurred on Chicago's westside. Per Spencer, the murder victims got killed because they robbed a dope dealer "Mack." Mack and Jones hung out together but he wasn't sure whether they did any [drug] work together. He never learned Jones had any connection to the dope that was stolen from Mack or the double murder. Mack never told him he participated in the murder but Spencer learned about it while he was in the Kankakee County Jail. He learned that "Dante" [Dockett] committed the murders and Spencer did not learn if anyone else participated. Tr. 70-75. Spencer also talked about "Main-Main." Spencer and Main-Main grew up in the same area, and Main-Main was "up under Larry [Jones] a lot," Main-Main was running one of the drug spots for Jones. During 2016 he and Main-Main had a conversation about some heroin. Main-Main didn't know what to do with the heroin he had and Main-Main didn't want to talk to Jones about it because Main-Main and Jones didn't see eye-to-eye and Spencer wasn't sure but it probably had to do with money. Spencer recalled that around February 2017 Main-Main was killed. Tr. 76-79.

**Under cross-examination** Spencer agrees he's testifying because he wants to lower his sentence. Further, he was charged in a separate case before another federal judge with felony drug possession and as part of his current deal, there

---

[3] Marsha Fountain was sentenced to a total 20-months and Jamar Spencer was sentenced to 72-months based on their guilty pleas to Count 1 in Indictment 20 CR 309. R. 158 and 208.

would be no jail time because that case was dismissed. That's part of his plea agreement and he does have eight prior felony convictions and was labeled a "career offender." Under cross, Spencer insists that he's "up here to tell the truth." Tr. 81-83. Spencer agrees he was facing 20-years and that included an agg battery charge involving a peace officer; but he denies beating up a police officer. Tr. 83-85.

Spencer was getting drugs from other suppliers in addition to Jones. Some of them were "Beatle Man," "Yogi," and "Curt." Tr. 85-86. And he doesn't remember the dates he got drugs from the different suppliers, he thinks he was getting it from Yogi in 2017, and from Curt in 2019; he would call and they would deliver the drugs to him and he had his own people selling for him. In other words Spencer had people selling for him but couldn't remember all their names–it was during 2017 and 2019. Then he remembers some of his drug sellers including "Doorman, Ice, Boo-Man," and "Peanut." Spencer agrees he had a lot of people selling drugs for him over time, he doesn't remember all the people, but he doesn't think it was as many as 20 or 25. They would come and go; but Spencer denied having his own drug trafficking organization. Tr. 87-90. Spencer agrees he was not charged as having an entire drug organization, only conspiring with Marsha and Jones, but not all the rest of the people he named. *Id.* at Tr. 90.

Other than the recorded conversations between he and others, a lot of what he testified about was "word of mouth," and someone recorded conversations he had with other people and he heard some of those conversations between he and

13

Jones, and here he was working with Marsha and Jones to try and make money selling drugs. Marsha bragged about calling herself a chemist and how she knew how to get and mix drugs from people she knew and she actually bought drugs including fentanyl. Tr. 90-92.

Spencer admits to being a member of the "Stones," and while he was never initiated, it was just something that happened. Tr. 93-94. Concerning what he means when he testifies about "word of mouth," Spencer explained that people say things, somebody tells you something, but just because somebody says something doesn't make it true; according to Spencer it depends on what that something is–meaning what the word of mouth is–or the subject [is]. Eventually Spencer concedes that because somebody says it doesn't make it true. Tr. 96.

Spencer testified concerning his personal drug history which includes ingesting ecstasy, meth, marijuana and drinking as much as a pint of liquor a day or more. Tr. 97-103. The last time Spencer used drugs or ingested liquor was the weekend before he got locked up. *Id.* at Tr. 103.

When questioned by the government attorneys and agents on March 12, 2021, he failed to recall–but apparently agrees that he told them he had no involvement with Jones or Marsha. Tr. 103-104. And regarding his own drug selling employees, they got paid in drugs, heroin and cocaine. He did not keep any records, books, or anything like that, nothing about who gave what as payment for drugs, so there are no records concerning his own drug involvement. Tr. 104-105.

**Redirect**: Although his weapon case pending before Judge Kennelly was dismissed, the facts of that case were including in his plea agreement before Judge Kendall. Tr. 107. Importantly, in connection with this case, he didn't possess any weapons and he was told not to mess with people or firearms. Tr. 108-110.

Spencer has been a member of the "Stones" for many years, and if you claim to be a member and are not that's frowned on. Tr. 110-113. How someone becomes a "Prince" in the Stones, he's not sure how that comes about, he is familiar with the title "General," and that has to be given to you, you have to earn it and it was about 10 years ago that Jones became a General. All Spencer recalls is that it just happened, he looked up and he was a General and you have to be nominated to be a General and he doesn't know who nominated Jones. Tr. 113-115. Spencer claims that he has not used ecstacy, cocaine, any drugs or alcohol since the weekend of his arrest and his ability to recall has not been impacted by drugs or alcohol. Tr. 116-117.

**Recross**: Spencer was arrested during Father's Day weekend during 2020. He was drinking the entire weekend, until he probably passed out, but if he didn't, he drank a great deal. And he used some Molly, marijuana and ecstacy because it was a long weekend. Tr. 119-120.

●     The next witness for the government during the afternoon of July 19, 2023, was Dante Dockett (Dockett). An overview of Dockett's criminal history and background reflects that he was charged with multiple other defendants in a RICO conspiracy under indictment 19 CR 641. That case was pending before the

15

Honorable Thomas M. Durkin. On May 25, 2022, pursuant to a plea agreement, Dockett entered a guilty plea before Judge Durkin. In 19 CR 641 at R. 474/475. On August 25, 2023, following his testimony in this case, where he acknowledged committing, *inter alia*, six (6) murders, Judge Durkin imposed [a] 360-month custodial sentence. 19 CR 641 at R. 968.

● Dockett's direct commenced on 7/19/23 at Tr. 122. At age 45, Dockett acknowledges pleading guilty in the RICO case before Judge Durkin. His plea/cooperation agreement requires him to be truthful. He admitted his leadership in the Traveling Vice Lords Street Gang (TVL). Dockett was a member of the "Wicked Town" TVL faction. From the 1990s until September 2017 he participated in six (6) murders along with many attempt murders and other acts of violence. Tr. 122-126.

During late January 2018, his friend, Donald Holmes Jr., was murdered. Dockett learned that some of his brother TVL members were involved in that murder. Thereafter, Dockett agreed to cooperate and provide information concerning many murders committed by the "Wicked Park" TVLs. As example, Dockett testified that he was paroled on 10/5/15 and was arrested during late September 2017. During those two years he committed a triple murder in Kankakee, along with three other murders. Tr. 126-128. Dockett grew up with Jones and around November 2015, they reconnected at the home of a drug trafficker, Donald Holmes, Sr. (a/k/a Big Don).

Several months later, during late 2016, Dockett arranged with Jones and Big Don to get heroin to sell. Dockett had a block on the westside where he sold dope, he considered it his own territory. During that time he learned that Jones, who he knew most of his life, was with the Stones and had some rank. Although they were with different groups, they were from the same neighborhood, grew-up together, so it was not unusual that they dealt with one another. Tr. 132-34.

Dockett explained his participation in the triple murder occurring in Kankakee during October 2016. Big Don's home was broken into and he suspected that the robber was "Dabo." So at Big Don's direction, along with Big Don's son, and another individual, Dockett traveled to Kankakee and went to Dabo's home. Dabo was there with his two sons. After some conversation Dockett "just killed them–participated in it." Tr. 138-39.[4]

Dockett then described a double murder which took place on the westside of Chicago on 12/23/16. That murder was a favor to Big Don because the murder victims had broken into and stole drugs from a dope dealer named "Mack." Tr. 139-140. When Dockett was asked whether Jones had any relationship to the stolen drugs–he answered "no." Tr. 142. (Dante then described the 12/23/16 westside double murder in great detail at Tr. 143-45).

---

[4] Dockett testified that he was receiving money from the government although he's in custody. Ironically, he was in the Kankakee County Jail as a federal prisoner. Dockett needed certain medications and the federal government was paying for those medications along with furnishing some other funds to him while in custody. Tr. 135-136.

Starting at Tr. 147, Dockett describes his participation in the attempt-murder of "Main." (Main may also have been known as "Main Main"). Per Dockett, Jones called him asking if he would meet with Breezy Montana. Jones wanted Dockett to be with Breezy because Dockett believed there was going to be a drug deal. Jones and Breezy were together every day; some people said Breezy was a bodyguard for Jones. But that's street talk and Dockett doesn't get involved in that. Tr. 149-50. Breezy and Dockett got together, and it turns out that Breezy was chasing down "Main." Dockett didn't know who "Main" was or anything about him. He saw Breezy was "tussling" with Main but he did not see "Twin" at the time. The deal was that Dockett would drive Breezy's car and if he heard any gunshots he would pick up Breezy. Turned out that Breezy wanted to use Dockett's gun but it jammed. The plan didn't end well; Breezy was shot and was limping so they returned to Dockett's house and he called Jones. "Main" had gotten away and all of this was reported to Jones. Tr. 150-59. Dockett testified that a couple of weeks later he got a text message and a newspaper article that Main was found dead. Tr. 159-60.

During the execution of a search warrant at Dockett's home drugs and a firearm were seized. Among the items taken from Dockett's home, were photographs and one of them was a photo of Jones, with Dockett and Dockett's wife at Dockett's birthday party. Tr. 161-62.

**JULY 20, 2023**, afternoon continued testimony of Dockett, starting with the cross-examination at Tr. 168.

Dockett agrees he committed murders, he took lives, and that was beneficial or helpful to him. Dockett was willing to kill people to benefit himself. Tr. 168-69.

Concerning the triple murder in Kankakee, the victims were a guy named "Dabo," along with his two adult sons. Dockett murdered the father and both sons. Per Dockett's amended plea agreement he also murdered three other people. Tr. 170-71. Dockett also explained that he shot many other people in self-defense while protecting himself. When asked questions about his "motivation" concerning the murders, Dockett maintained that he shot at people, it was always self defense. He told the government about all the other "incidents"–meaning shooting at people. Tr. 171-74.

Dockett admitted that he was also selling drugs at the same time which he did to benefit himself. According to Dockett's amended plea agreement the government will recommend a sentence of not less than 20 no more than 30 years. Thus, for murdering and attempting to murder people, the most that will happen is the government recommending a 30-year sentence. Tr. 174-75.

Dockett agreed that over the years the government paid him over $16,000 while he's been in custody. Dockett explained that those funds were for medication and making phone calls. Some of the government money was also used for commissary but most it was for medication and phone calls to his family. Tr. 175-76.

He was with the Wicked Town TVLs since he was 13 or 14, they are a faction of the Vice Lords. The Vice Lords have different branches and factions but

19

they all work together and are part of the TVLs. Tr. 177. He didn't work with the
Black P Stone gang, but that doesn't mean that they're at war with them, or that
they're rivals. The Stones controled different territories and they never had a
serious problem with the Stones. Tr. 177-78. Dockett associated and grew up
around the Stones all his life so none of that is unusual. And, there's always a lot
of "talk" in the neighborhood about many things; but he generally didn't pay
attention to any of that, because "they lie." According to Dockett, regarding street
talk, the lies simply get repeated by people but that doesn't make it true–Dockett
agrees with that. Tr. 178-79.

When Dockett became a TVL, he was "blessed" into the gang, just took an
oath, in front of a group and he became an official TVL member. Dockett denies
that he's seen anyone claim to be a member of the TVLs or some other gang, even
when they were really not a member of the gang; he's never seen that happen. As
far as he knows, the other gangs all involve taking an oath and that means "blessed
in." The Latino gangs are different, but black gangs involve taking an oath, and
that makes someone an official member. Tr. 180-81.

Dockett is not being prosecuted in any Illinois court and he's hoping it
won't happen. But if it happens, it happens and he won't cry over it if it happens.
He did what he did, if he's prosecuted in State court after this, it is what it is. Tr.
182.

Dockett agrees he's a career offender and has felony convictions going back
to 1996; and under the advisory guidelines, he was to receive a life sentence, and

he's doing everything he can to avoid getting a life sentence. Tr. 182-83.

**REDIRECT:**

Between 2015 and the fall of 2017, Dockett participated in six murders, and several other attempted murders. And during that time he was an associate of Larry Jones, went to his birthday party, he came to Dockett's birthday party, and that's where the picture was taken. During those years Dockett sold drugs and hung out with Jones. Dockett didn't hide his violence. Tr. 183-84.

Regarding the murder of Antonio Watkins (a/k/a "Main") there was no benefit to Dockett, and because Jones was his friend it benefitted Jones, actually it benefitted both of them. Tr. 184-85. Dockett benefitted from the sale of drugs, and Jones supplied the drugs, so that was a benefit to Jones. Dockett explained that if he got 50 or 100 grams, Jones would get $8,000 for 100 grams, stuff like that, so Jones had a benefit from supplying him with drugs. Tr. 186.

Concerning other acts of violence, there was a single time it happened with Jones. Another Stone named "Cash," said that Jones was an informant because Cash's house was raided and Cash told others that Jones had given the police the information concerning Cash. Jones requested help from Dockett and Breezy, and they found Cash in a barber shop; in the barber shop Cash fought with the three of them. Tr. 187-89.

On redirect, Dockett repeated that in order for him to secure the government's 20-30 year sentencing recommendation he must be truthful and, if not, the plea agreement goes out the window. However, if Dockett truthfully

relates other crimes that he had not previously told the government about, the 20-30 year sentencing recommendation would stand. Tr. 189-91.

**RECROSS:**

Dockett told the government about all the murders he's been involved in or participated in. Tr. 191-92.

- **Arguments of Counsel, Findings of Fact and Sentencing.**

The report of proceedings for July 20, 2023, starting at Tr. 193 captures the court's discussion of the disputed guidelines. The government, articulating its guideline positions, maintained the marijuana furnished by Jones to Spencer eventually involved 25-50 grams of heroin for a period of time. Although there were no ledgers or documents maintained by Spencer because he had his own drug trafficking activities–separate and apart from Jones–Spencer provided the time line for receiving the drugs which included some time in 2018. Spencer had been injured during March or April after he was kidnaped and did not return to drug trafficking until about October 2018. Jones and Spencer renewed their drug relationship thereafter and, per Spencer's plea agreement, that's when Jones was supplying Spencer with heroin. Tr. 194-95. Regarding wiretaps or other interceptions, concerning Spencer/Jones, there were none for any specific transactions. With that, the government maintained that Jones should not have the benefit of an acceptance of responsibility. The government explained its position by converting grams into kilograms of heroin and marijuana. The government's estimates came from Spencer who maintained those were the amounts he

purchased from Jones from 2016-2019. (The timeframe regarding the Jones/Spencer indictment spans only from about August 6, 2018, to about September 3, 2019. App. 1-12.).

The government argued that based on Dockett's testimony he got 25-50 grams of heroin at a time which corroborates Spencer's testimony for that same period of time. Tr. 196-98. But recall that Dockett was arrested in the RICO conspiracy case for which he pled guilty during September 2017. Therefore, he was not involved in drug trafficking, with or without Jones, during 2018-2019.

Defense counsel argued that the drugs charged in the Jones indictment concerned an informant "Mack," and the drugs involving Spencer. The Jones/Spencer drug deals did not rise to the amounts calculated by the government. Importantly, according to the PSR, Jones' phone was tapped during this entire time, but there is nothing there; just like Spencer's testimony, there is no specifics in terms of his dealings with Spencer. Moreover, Spencer had his own drug organization at the same time and had sources other than Jones for his drug organization. Furthermore, there were no records of any kind supporting Spencer's testimony. Spencer also failed to recall much of his alleged drug dealings with Jones and, attached to defendant's sentencing memos (R.184, 198), Marsha Fountain was bringing drugs and mix and was doing all kinds of things with no specificity concerning amounts or quantities. Tr. 198-201.

Defense counsel's argument continued by pointing out that the government has indicated the quantities that they're asking the court to consider were

23

"estimates," which would be "guesstimates"–it's just guessing. There were transactions between Spencer and Jones and Jones has not denied they were dealing drugs, working together and trying to make money. But there is no accurate testimony concerning quantities and nothing that can come close to the quantities the government is claiming.

Hence, the reason the defense maintains that the amounts in the indictment, that we have on tape with Mack, and he wasn't brought in here to testify by the government, so far as we know, for certain, and instead of guessing, that's the 178 grams of heroin. And looking at 2D1.1, you look for 100-400 grams, and no one likes drug distribution, but you don't guess, and add things up that really have no real support. Importantly, the defense level is 24 – and that's based on 100-400 grams. The defense position is that you cannot guess, and add things up, therefore, based on 100-400 grams, you get a BOL of 24, under 2D1.1. Tr. 201.

AUSA Arce, takes issue with that, calculating, as example Jamar Spencer noted that during a certain timeframe he was buying quantities of drugs from Jones, and that's corroborated by Dockett; that's what Jones did for a living. Concerning Spencer's draft plea agreement, Spencer put all the weight on himself because he fully cooperated with the government, acknowledging his conduct instead of taking responsibility for just the transactions outlined in the four corners of the indictment. Spencer was lucid, testified credibly both in terms of quantity and types of drugs that he transferred with Dockett or with Jones as corroborated by Dockett because of similar transactions with Dockett. Tr. 201-202.

24

Following the arguments of counsel, the court explained that where there is a dispute without any type of evidence to support it, the court has a much more difficult situation but here there is the testimony of two individuals, Spencer and Dockett, testifying about their own criminal activity, and the criminal activity they engaged in with defendant. However, at bar, the court finds that Spencer and Dockett, were credible because they corroborated one another. The court believes the estimated drug quantities [proffered by the government] were appropriate. In fact it's an under-representation – under-represented by the ongoing interaction with Spencer/Dockett and the defendant. If we dug into it more, it would go higher, but certainly supported by the testimony. Thus, the BOL will be 32. Tr. 202-04. App. 63-65.

The court then turned its attention to the role Jones played in the overall scheme. Was he a leader or organizer? Defense counsel claims they were all in it together, Spencer, Fountain, and Jones; they were selling drugs, doing different things, there was no hierarchy. Given the association between the three, according to the defense, they were in a partnership and no one was really in charge. Tr. 205-06.

The government's position is otherwise. Specifically, the government points to defendant's plea agreement which according to the government indicates that Jones, by his own admission, is the leader of the conspiracy involving himself, Spencer and Fountain. Tr. 207-08. The trial court interjects and inquires of the government concerning Dockett's testimony and didn't Dockett conduct one of the

25

shootings to benefit Jones. Of course, the government agrees but that would have occurred (not mentioned by the parties) long prior to the on or about indictment dates being August 6, 2018, to about September 3, 2019.

The sentencing court finds that the two-level increase is warranted. Therefore, the drug and money laundering guilty plea counts and drug quantities are at a level 32 and two additional levels for defendant's role in the offense puts it at a level 34. Tr. 210. (Defendant is not challenging the two-level role-enhancement).

The government, from Tr. 210-214, argues that defendant is not entitled to an acceptance of responsibility reduction. The defense insists that Jones was candid with the court, pled guilty, made admissions and therefore he should be entitled to the § 3E1.1 three-level reduction. Tr. 214-16. The sentencing court grants Jones' three-level acceptance of responsibility while noting that she believes it would be "improper for me to suggest that he's required to admit to the relevant conduct that they put on the stand today ..." Tr. 216. The court then calculated the advisory guideline range on Counts One and Three to be 151-188 months. The statutory provisions on Count One are 5-40 years and on Count Three, 0-20 years. Tr. 217. The court, in advance of conducting its § 3553 analysis entertains the arguments of counsel. Tr. 217.

The government contends that the top of the 188-months guideline range is appropriate. The government discusses heroin, fentanyl and argues that defendant was selling wholesale quantities of heroin, 25-50 grams at a time. Jones was not

involved in .1 gram quantities, but, rather, in quantities of about 250 or 500 doses per transaction. He was acting with Messrs. Spencer and Dockett, and Ms. Fountain; Jones was the boss and dealing dope for his livelihood. And while Jones is not charged with any of the deaths discussed by Dockett, that highlights the dangers associated with "defendant's profession," and the "triple deaths are presented because they're the direct consequence of defendant's drug trafficking enterprise, per the testimony of Dockett. Tr. 217-221. Furthermore, the government maintains that murder victims were members of the "Wicked Town" TVLs who robbed a stash house belonging to "Mack," who was part of the Stones. Dockett tried to recover contraband from a couple of the TVLs and when they ignored him, Dockett felt "slighted," so he murdered them per Dockett's plea agreement. These were the people defendant associated with. More about Dockett at Tr. 222-224. The government asserts that if defendant, age 42, is returned to society after a five-year sentence, he would return to the life style he's had and therefore the specific deterrents of a 188-month sentence is required. Tr. 225-26.

Defense counsel points out that defendant's attempt murder conviction occurred when he was 16, tried as an adult and that should not have been factored into the PSR. Further, there are no issues concerning drugs being bad, but here defendant raised himself on the streets, and he was tried as an adult when he was 16. Tr. 226-27. The defense maintains that defendant is being accused of guilt by association because of his neighborhood and the nature of life there. But there is a mix of people, all kinds of people from the neighborhood, people doing all kinds

27

of things, sometimes true, sometimes not. But the government is focusing on things for which he was not charged and if he did all those things why wasn't he charged with them? Tr. 227-28.

It's very difficult to refute things because they say it, and defense counsel knows how generally the courts are – those allegations are just accepted wholeheartedly. Defense counsel talks about "Mack" as someone Jones gave drugs to apparently and his spot was robbed or whatever, and defendant is somehow supposed to have some interest in that but accepting that kind of thing is inconsistent with the Constitution. Tr. 230-31. Defense counsel then talks about his sentencing memo and all the letters that the court has received concerning defendant who is doing the best he can under circumstances to get himself going; he has learning issues and per the PSR he has difficulty reading and understanding things but defendant has made great strides from where he came. Tr. 231-32.

Concerning defendant's potential sentence, there is a mandatory five-year sentence and that's what defense counsel recommends. Given what he's charged with, and what he has admitted to and what he's done, that's a significant sentence. It will give Jones times to go to school and it sends a message to others that if they do things like that it takes a good chunk out of your life meaning a five year sentence which is long enough, but not too long. Tr. 232. Marsha Fountain received a 20 month sentence and in the government's sentencing memo she was doing a lot in terms of drugs, including fentanyl, knowing how to mix it. She was not a novice or anything like that so looking at it in terms of sentencing disparity

"to give Jones some sentence that's far, far in excess of her sentence, would be unwarranted." Tr. 233. At this point the court can see that defendant has a decent job and he was working that job before he was remanded to custody and that letter was attached so the court could see he was doing something positive including getting other people jobs. After he pled guilty he was taken to the Kankakee County Jail which is hardly the same as a federal institution. They have no programs of any kind, and he's been in custody there since his guilty plea. But he's doing everything he can and is involved in religious matters, and trying to help other people to get on the right path. Tr. 233.

When he was released in this case he was on house arrest and could only go to work for a while, and go to church and that was about for two years and he didn't violate anything, he didn't do anything to stay past his time where he would go to work and go to church. He was basically incarcerated at his grandmothers' house who didn't want him there; and then all the Covid issues came about so basically he's been serving time since he was arrested [in this case] and now he's serving harder time that it would at the MCC. He's already started on his road to rehabilitation which is the reason that a five year sentence is sufficient and a deterrent to others. If people are selling drugs who want to use (lose) their lives in five or seven year chunks they won't have much lifetime to be free. Here Jones has learned his lesson and he's not a person who will be back. Tr. 234. Defense counsel is urging that it be recommended that he serve his sentence somewhere where he can basically learn to read and write and he can do that now with help

29

but there is a long way to go. The defense disagrees with the government's recommended 180 month sentence but there is a lot of things here that don't make sense and were not charged. The appropriate sentence here would be closer to five years which would also remove any notion of disparity even though it would be double what Ms. Fountain received. Tr. 235-36.

The sentencing court directs the government to address disparity and the government talks about defendant's earlier attempt murder when he was 16. According to the government he shot two people with a gun and the details of that conviction are in the PSR at p. 12. Tr. 236-37. And in response to another question from the court regarding [a] gun, the government agrees that there is a tape recording where Jones would sell a gun to someone undercover but it was never consummated. Tr. 237. The government further contends that comparing Jones to Ms. Fountain is like comparing apples to elephants. There should be a huge disparity between them because there is a huge disparity in their conduct. Jones was the leader of this conspiracy and he understands why defense counsel is arguing about disparity but even in his plea agreement Jones agrees she was doing things at his direction and was one of his workers. Tr. 237-38.

Regarding acts of violence the government is not seeking the court to find Jones guilty of ordering the murder of Antonio Watkins (a/k/a Main) but here is what we're doing because this is a guideline case, 151-188 months. At any rate, per the government, defendant's conduct is what distinguishes him from others in the same guideline range. Thus, the court can consider acts of violence involving

defendant's drug trafficking and that was part of the evidence presented by the government which distinguishes Jones from others in the same guideline range. Tr. 238-41.

The sentencing court is aware that defendant has a prior possession of drug conviction and defense counsel agrees, but he has no convictions for any acts of violence. Defendant has taken complete responsibility for what he's done and has never denied he was involved in drug activities. But given his lack of structure growing up and the strides made in getting reasonable employment the government's sentencing recommendation is not warranted in this case. Tr. 242-43.

Defendant is told he has the right to address the court and, after speaking to his lawyer for a moment addresses the court and apologizes to the court, his family and his son. Jones tells the court that he failed his son and it's very embarrassing because he made sure his son finished high school and if he was hard on him, it was because there was no one when he was young to be hard on "me or I might could have made it." He'll never do it again. Tr. 243.

Commencing at Tr. 244 the court discusses the Austin neighborhood in Chicago and how dangerous drugs have made that community and in fact, heroin takes people away from being parents like defendant's own mother. Defendant agrees. Tr. 244. The court goes on to discuss defendant's pattern of misconduct growing up from drug offenses to armed robbery, disorderly conduct, attempt murder, probation violations and violating the rules. When he was released from

Illinois prison in 2001 he violated his parole and went back into custody and then he was convicted of selling "rocks" on the street and he got two years in custody for that. The court, in advance of imposing sentence, tells defendant that he is not being held responsible for attempt murder, or the murder of Watkins, or the beating of Cash, but he's really not accepted all the responsibility he should, and he cannot be compared to Ms. Fountain regarding sentencing disparity. Tr. 247. The court holds that Jones is minimizing his role and not admitting that there was any gang involvement, notwithstanding the testimony of Messrs. Dockett and Spencer. Tr. 247-48. The court's sentencing findings are from Tr. 243-49. The court imposed the top of the advisory guideline range sentence of 188-incarcerated months with four years of supervised release. Tr. 257-58. The sentencing court's factfindings appear at App. 63-73, *infra*. Those factual findings are from ROP. 7/20/23 at Tr. 202-04, 215-16 and 244-49.

This appeal ensues.

## SUMMARY OF ARGUMENT

The sentencing court erred by including Dante Dockett's six (6) murders and attempt murders which took place in Kankakee and Chicago between 2015 and 2017. Dockett's drug dealings occurred during the same timeframe and his suppliers included "Big Don," Jones and unnamed others. The government successfully urged the sentencing court to incorporate Dockett's multiple acts of violence and drug dealing as part of defendant's "relevant conduct." However, the

charges against defendant in indictment 20 CR 309 encompassed drug and money laundering–related offenses occurring from about August 2018 to September 2019.

Similarly, the sentencing court embraced the government's relevant conduct arguments regarding Jamar Spencer who conceitedly–had drug dealings with defendant. But, at the same time, Spencer had his own drug suppliers and trafficking crew which was apparently active until his arrest during Father's Day weekend, 2020, in connection with Indictment 20 CR 311. That indictment charged Spencer and others with possessing a firearm as a convicted felon.

In the ensemble, the relevant conduct offense levels added approximately 10-years or 120-months to defendant's 188-month sentence.

## ARGUMENT

**I.     Whether the District Court Erred by Including as Uncharged Relevant Conduct Drug Amounts and Violent Acts from a Time Period Distinct from that Appearing in Defendant's Drug Trafficking/Money Laundering Indictment?**

### A.     STANDARD OF REVIEW:

In U.S. v. Young, 863 F.3d 685, 688 (7th Cir. 2017), the court, embraced Gall v. U.S., 552 U.S. 38, 51 (2007), while discerning the reviewing standards where defendant is challenging his sentence based, *inter alia*, relevant conduct as having a significant impact on defendant's sentence ("We review the substantive

reasonableness of a sentence under an abuse-of-discretion standard, but we "must first ensure that the district court committed no significant procedural error, such as ... selecting a sentence based on clearly erroneous facts...." * * *. We have thus said that "whether the district court followed the proper procedures in imposing sentence is a question of law that we review *de novo*." * * *.). (Some quotation marks in original). See also U.S. v. Mendoza, 510 F.3d 749, 754 (7th Cir. 2007). The sentencing court's calculation of the quantity of drugs involved in an offense is reviewed for clear error. U.S. v. Bacallao, 149 F.3d 717, 719 (7th Cir. 1998).

    **B.**    **SENTENCING PRINCIPLES**:

    1.    The Due Process Clause of the Fifth Amendment incorporates the proposition that the defendant has the right to be sentenced based on accurate information and compelling testimony. In U.S. v. Rollerson, 7 F.4th 565, 569 (7th Cir. 2021), the court explained defendant's sentencing due process protections: ("A criminal defendant has a due process right to be sentenced based on accurate information.... [W]here the district court sentences a defendant based on the drug-quantity guidelines, it must find the government's information sufficiently reliable to determine drug quantity by a preponderance of the evidence." * * *. Rollerson claims that the uncharged and acquitted drug amounts should not count toward his guideline range because the prosecution failed to prove them with reliable information by a preponderance of the evidence.") (Internal citations omitted).

2.     Relevant conduct is a fearsome tool of the government in drug cases. In <u>U.S. v. Duarte</u>, 950 F.2d 1255, 1263 (7th Cir. 1991), the court explained how relevant conduct operates in the drug sentencing universe ("relevant conduct" or "aggregation rule" "grants the government a fearsome tool in drug cases. It permits prosecutors to 'indict defendants on relatively minor offenses and then seek enhanced sentences later by asserting that the defendant has committed other more serious crimes for which, for whatever reason, the defendant was not prosecuted and has not been convicted.' " 950 F.2d 1255, 1263 (7th Cir.1991). However, the relevant conduct rule has limits. The rule allows sentencing courts to consider quantities of drugs not specified in the counts of conviction, provided "the unconvicted activities bore the necessary relation to the convicted offense." *Id.* * * *).

In <u>U.S. v. Ortiz</u>, 431 F.3d 1035, 1040 (7th Cir. 2005), the court explained relevant conduct and its components:

> In assessing whether offenses are part of the same course of conduct, we look to whether there is "a strong relationship between the uncharged conduct and the convicted offense, focusing on whether the government has demonstrated a significant 'similarity, regularity, and temporal proximity.' " * * *. Offenses are part of the same course of conduct if they are "part of a single episode, spree, or ongoing series of offenses." U.S.S.G. § 1B1.3(a)(2), App. Note 9. Moreover, "section 1B1.3(a)(2) must not be read to encompass any offense that is similar in kind to the offense of conviction but that does not bear the required relationship to that offense." * * *. We have held that the mere fact that the defendant may have engaged in other drug transactions "is not sufficient to justify treating those transactions as 'relevant conduct' for sentencing purposes." * * *.

(Internal citations omitted, quotation marks in original).

### C.    Argument and Authorities Supporting Relief.

The government will acknowledge that the only issue raised by Larry Jones during his guilty plea and sentencing proceedings concerned the impact of the uncharged drug quantities on his advisory guideline range (*i.e.* relevant conduct). The record reflects that the defense maintained the indictment drug quantities, along with acceptance of responsibility, brought him to a level 24. ROP 1/19/23 at Tr. 11-12; ROP 7/20/23 at Tr. 201. The government's position was that the drug quantities, including the uncharged conduct, rose to a level 34 and with acceptance of responsibility (which they unsuccessfully challenged) the advisory guideline range was 31 with a top guideline sentence of 188-months.

The sentencing court imposed the top of the guideline sentence–188-months.

●    Jamar Spencer testified that between October 2015 and 2020 he did drug deals with Jones and other suppliers. Spencer could not recall how much marijuana Jones supplied during that time frame. ROP 7/19/23 @ Tr. 47. But his plea agreement includes over 12 kilos, along with heroin (about 5 kilos) and about 100 grams of fentanyl-laced heroin and about 85 grams of crack [cocaine]. Tr. 48-49.

But Spencer had other drug suppliers including "Beatle Man," "Yogi," and "Curt." Tr. 85-86. And Spencer couldn't remember the dates he got drugs from the different suppliers; he thought he was getting it from "Yogi" in 2017 and from

"Curt" in 2019. Spencer would call and they would deliver the drugs.

Moreover, Spencer had his own drug trafficking crew during 2017 and 2019; eventually naming some of his drug sellers—"Doorman," "Ice," "Boo-Man," and "Peanut." Spencer agreed he had many people selling drugs for him, but didn't think he had as many as 20 or 25 sellers because they would come and go. He agreed he was not charged with having an entire drug organization; only conspiring with Marsha and Jones–but not the rest of the drug sellers and suppliers he named. *Id.* at Tr. 87-90.

●    Concerning Dante Dockett and his RICO conspiracy guilty plea in 19 CR 641, he acknowledged committing six murders and countless attempt murders.

Shortly after he was released from an Illinois sentence during the late summer or fall of 2015, he did a favor for Donald Holmes Sr. (a/k/a "Big Don"). It was not a simple–have a talk with someone favor. It was–do me a favor–I want you to go to Kankakee and kill someone who may have stolen some drugs from my home or one of my drug suppliers. So Dockett and two of his acolytes drove to Kankakee and committed not one, not two, but three murders at the behest of "Big Don." And, Big Don was one of Dockett's heroin suppliers (along with Jones). Importantly, the drugs that Dockett received from Jones had to be supplied almost a year before August 2018 because Dockett was arrested during the late fall of 2017.

But the "Big Don" saga becomes transfixing because in 18 CR 356, Big Don was charged in a multi-count, multi-defendant drug conspiracy. And he had a

plea agreement. After Big Don pled guilty to his "superseding" information, the government's publically available sentencing memo urged [that] Big Don receive a reduced sentence of 10 years because of his health circumstances. Indictment 18 CR 356 at R. 250 dated 9/5/2023 (approximately five weeks after Larry Jones received a 17-year sentence in the case at hand). But that's not the end of the story.

Notwithstanding the government's publically filed 10-year sentencing memo, it filed another "sealed" memo on 9/5/2023 at R. 251. And a few days later, "Big Don," this very controlling drug trafficker who gets people murdered as a favor–was sentenced to "one day of time considered served," concurrent as to superseding information Counts One and Two.

So we are left to ponder: How is it that Dante Dockett, the six-time conceded murderer, excluding his attempt murders, and all his drug trafficking and his lengthy criminal history, can get a total 360-month sentence and "Big Don" is sentenced to "one day" time considered served?[5]

But there is more. Mr. Dockett had a pending indictment before his 19 CR 641 RICO conspiracy before Judge Durkin. Mr. Dockett also had a pending case in this district under 18 U.S.C. § 710 which was dismissed based on the government's motion. 18 CR 710 at R. 68.

Defendant maintains that the government's reliance on dual informants and their plea agreements create a dangerous paradigm. Adding insult to injury, for the

---

[5] Was it coincidental that Big Don avoided a lengthy custodial sentence because he furnished information concerning Larry Jones ... who was sentenced about a month before "Big Don"?

38

district court to embrace the dual-informant paradigm, flies in the face of this Court's jury instruction #3.05. Approved jury instruction 3.05 directs the fact trier to keep in mind "that you must consider that testimony [informant testimony] with caution and great care." Neither Spencer nor Dockett produced anything other than their conjoined alleged recollections concerning drug quantities attributed to Jones–where both had drug quantity suppliers–other than Jones. And for the government to argue that both were being truthful because of their respective plea agreements advances those self-serving agreements to something akin to the Holy Grail.

Defendant advances that were this Court to affirm the sentence imposed based on unreliable informant testimony, it would be creating a dubious and dangerous precedent. It would invite the government to parade plea agreed/compensated drug informants, with horrific criminal records to corroborate one another concerning drug quantities that may not have been distributed one or more years earlier. Regrettably, those are the facts are bar!

● Jones maintains that the district court prejudicially erred when it embraced the government's U.S.S.G. level 32 drug quantity estimates. Most were based on events that preceded the indictment by anywhere from *several months to two years*. As example, Spencer testified to the drugs he claimed (no records or ledgers–his recollection was refreshed by looking at his plea agreement) Jones supplied during 2016, 2017 and 2019. But the operative dates according to the indictment were that Jones was distributing drugs (conspired with Spencer and

39

Fountain) from about August 2018 to about September 2019. Hence, precedent reveals that temporal proximity is clearly absent.

In U.S. v. Brasher, 105 F.4th 1002 (7th Cir. 2024), the court rejected Brasher's plain-error arguments regarding drug quantities and relevant conduct. The Brasher facts for that Brasher was involved in supplying large meth quantities to individuals in Illinois and elsewhere during 2018 and 2020. His meth was coming from California and he saw to it that monies would be forwarded to California. In the fullness of time a couple of southern Illinois meth customers were caught and they not only supplied the government with information, but they turned over quantities of drugs and U.S. currency.

Brasher, represented by counsel, pled guilty. Concerning his PSR offense level of 33, and his criminal history of III, that gave rise to a sentencing guideline range of 168-210 months.

In advance of sentencing, regarding the drug quality (*not quantity*), he asked that the district court treat the meth as a "mixture and substance containing meth" because it carries a lighter sentencing. 105 F.4th at 1005. In a nut shell, Brasher raised no relevant conduct challenge in advance of sentencing and, therefore, the district court failed to address the issue. *Ibid*. Brasher was sentenced to 200 months and, on appeal, by way of plain error, he sought sentence review based on the difference between his 2018 and 2020 meth-conduct. Brasher, 105 F.4th at 1006-07.

The <u>Brasher</u> Court noted that the offense of conviction occurred in late October 2021 but his interaction in southern Illinois commenced in December 2019 and lasted until the summer of 2020. The plain error/relevant conduct issue included noting:

> "[W]ithout temporal proximity, the government needs a stronger showing regarding the other course of conduct factors, such as regularity or similarity of acts." *United States v. Ortiz*, 431 F.3d 1035, 1041 (7th Cir. 2005).

105 F.4th at 1007 (quotation marks in original).

The <u>Brasher</u> Court agreed that "temporal proximity" was lacking, and discussed 7ᵗʰ Circuit precedent which includes [that] an eight-month gap was "enough to cast doubt on the relevance of the earlier conduct," and the same holds true for ten months. Sister circuit cases are also cited in <u>Brasher</u> involving five and six month gaps between charged offense and prior misconduct involving drugs. *Id.* at 1007, also citing <u>U.S. v. McGowan</u>, 478 F.3d at 802, <u>U.S. v. Ortiz</u>, 431 F.3d at 1041. <u>Brasher</u>, 105 F.4th at 1007, citing sister circuit cases including <u>U.S. v. Mullins</u>, 971 F.2d 1138, 1144 (4ᵗʰ Cir. 1992); <u>U.S. v. Hahn</u>, 960 F.2d 903, 911 (9ᵗʰ Cir. 1992).

Thus, the lack of temporal proximity sets a higher bar for uncharged conduct sentencing inclusions. Notwithstanding that settled precedent the <u>Brasher</u> Court held that there was no plain error and went on to affirm Brasher's sentence.

Judge Jackson-Akiwumi wrote a separate concurring opinion expressing her dissatisfaction with the manner in which district courts readily permit uncharged conduct (*e.g.* relevant conduct) to be used with significant frequency because,

*inter alia*, "[S]entencing based on relevant conduct is a constitutionally dubious proposition on its own, but our circuit's weakened standard only exacerbates the risk of a constitutional violation. It's time we correct course." <u>Brasher</u>, 105 F.4th at 1009-1010 (our quotation marks).

Her concurring opinion points out the difficulties with the guideline manual comments including § 1B1.3 and 1B1.3(a)(1)(A) and §§ 1B1.3(a)(2), (3). *Id.* at 1010.

Judge Jackson-Akiwumi's concurring opinion cites Justice Scalia's comments concerning how sentencing a defendant for uncharged conduct could lead to "absurd results," and now Justice Kavanaugh, D.C. Circuit, recognized the regime [relevant conduct] as a "dubious infringement of the rights to due process and to a jury trial," citing <u>U.S. v. Bell</u>, 808 F.3d 926, 928 (D.C. Cir. 2015).

See also <u>U.S. v. Draheim/Lewis</u>, 958 F.3d 651, 659 (7th Cir. 2020) (To be clear, relevant conduct does not "encompass any offense that is similar in kind to the offense of conviction but ... does not bear the required relationship to that offense." *Ortiz*, 431 F.3d at 1040 (quoting *United States v. Patel*, 131 F.3d 1195, 1204 (7th Cir. 1997)). We have emphasized that the "mere fact that the defendant has engaged in other drug transactions is not sufficient to justify treating those transactions as 'relevant conduct' for sentencing purposes." *United States v. Purham*, 754 F.3d 411, 415 (7th Cir. 2014) (quoting *United States v. Crockett*, 82 F.3d 722, 730 (7th Cir. 1996)).).

• Jones contends that the intersecting equation between temporal proximity and the erroneous encompassing of offenses that are similar in kind to the offense of conviction fails to support the sentencing court's elevation of defendant's base offense level from 24 to 31. As example, the sentencing court credited Jamar Spencer's testimony concerning drug quantities from Jones during 2016, 2017 and 2019 and Dante Dockett testified that Jones and "Big Don" supplied him with drugs at some point between late 2015 and 2017.

But for *temporal proximity* purposes our court's precedent explains that gaps of five, eight and ten months fail to support the required relevant conduct temporal proximity. Jones' offenses of conviction were between about August 2018 and September 2019. For temporal proximity analytical purposes that Spencer's 2016 interactions with Jones clearly failed to bridge the temporal proximity gap; same with 2017 (and Spencer testified that he had additional drug quantity sources other than Jones during the same timeframes). ROP 7/19/23 at Tr. 85-89. And the sentencing court's statements that Jones and Dockett corroborated one another although Dockett had no drug dealings with Jones after an undisclosed time in 2017 (again he was also receiving quantities of drugs from "Big Don" from about some time in late 2015 to at some undisclosed point in 2017).

Moreover, circuit precedent clearly holds that where the defendant is engaged in the same type of drug dealing during the putative relevant conduct timeframe–that fails to support, along with the lack of temporal proximity, the

level of drug quantity trafficking required to support the sentencing court's elevated [relevant conduct] BOL from 24 to 31 (meaning the top of the level 31 guideline range was the 188-months sentence Jones received). See also U.S. v. Rollerson, 7 F.4th 565, 572 (7th Cir. 2021) ("[T]he fact that a defendant engaged in uncharged or acquitted drug transactions is not sufficient to justify treating those transactions as 'relevant conduct' for sentencing purposes.") (citing Ortiz, 431 F.3d at 1041 and Crockett, 82 F.3d at 730). And in Ortiz, the court, examining the impact of U.S.S.G. § 1B1.3(a)(2) App. Note 9, the court explained [that]: "section 1B1.3(a)(2) must not be read to encompass any offense that is similar in kind to the offense of conviction but that does not bear the required relationship to that offense." Ortiz, 431 F.3d at 1040-41 (quotation marks in original).

Defendant maintains that the sentencing court clearly and prejudicially erred when attributing the drug quantities that Messrs. Spencer and Dockett contended had been supplied by Jones–because their testimony cannot pass the Due Process/reliability evidentiary hurtles which remain the hallmark of that which is required for sentencing affirmation. See U.S. v. England, 555 F.3d 616, 622 (7th Cir. 2009) ("[W]e grant sentencing courts discretion to draw conclusions about the testimony given and evidence introduced at sentencing. * * *. Yet, this discretion is neither boundless nor is the information upon which a sentencing court may rely beyond due process limitations. To the contrary, we recognize that due process requires that sentencing determinations be based on reliable evidence, not speculation or unfounded allegations. * * *; see also *United States v. Berry*, 553

44

F.3d 273, 284 (3d Cir.2009) ("A defendant cannot be deprived of liberty based upon mere speculation."). Indeed, the Supreme Court has long recognized that "[n]o individual or body of men has a discretionary or arbitrary power to commit any person to prison." *Hurtado v. California*, 110 U.S. 516, 4 S.Ct. 111, 28 L.Ed. 232 (1884). If the district court relied on unreliable or inaccurate information in making its sentencing decision, we return the case to the district court for a new sentencing hearing. * * *.) (Quotation marks added, some supporting authorities omitted).

## CONCLUSION

Larry Jones, defendant-appellant, respectfully moves that, accordance with his foregoing arguments, this Court enters its order or orders vacating his 188-month custodial sentence and remand his sentencing for further proceedings including, the possibility of having a jury determine the relevant conduct sentencing issue in the case at hand.

Respectfully submitted,

/s/ Allan A. Ackerman

ALLAN A. ACKERMAN
Attorney at Law
Counsel of Record
19 S. LaSalle Street, Suite 502
Chicago, Illinois  60603
Telephone:  312- 332-2891
Facsimile:   312-750-1595
Email: profaaa@aol.com

Counsel for Larry Jones
Defendant-Appellant

CERTIFICATE OF COMPLIANCE WITH FRAP RULE 32(a)(7)(C)

The undersigned certifies that this brief complies with the volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(C) and Circuit Rule 32 in that it contains 11,801 words as shown by Word Perfect 12 used in preparing this brief.


/s/ Allan A. Ackerman
Counsel for Larry Jones
Defendant-Appellant

Dated: September 25, 2024

NO.  23-2557

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

---

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

vs.

LARRY JONES,
Defendant-Appellant.

---

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:20-CR-00309-1

Honorable. Virginia M. Kendall, Judge Presiding.

---

NOTICE OF FILING AND CERTIFICATE OF SERVICE

TO:  Mr. Christopher G. Conway, Clerk of the Court, United States Court of Appeals,
219 S. Dearborn St., Chicago, IL 60604

Mr. Jimmy L. Arce, Assistant U.S. Attorney
219 S. Dearborn St., Ste 500, Chicago, IL 60604
Jimmy.Arce@usdoj.gov

Please take notice that on September 25, 2024, using the Seventh Circuit CM/ECF System, we electronically filed Larry Jones' Opening Brief and Required Appendix in the above-captioned appeal. Undersigned counsel of record, certifies that he electronically served the foregoing Opening Brief and required Appendix on the Office of the United State's Attorney in Chicago on September 25, 2024 via the Seventh Circuit CM/ECF System.

s/ Allan A. Ackerman
Allan A. Ackerman,
Appellate Attorney for Larry Jones

Allan A. Ackerman, Esq.
Attorney at Law
19 S. LaSalle Street, Suite 502
Chicago, Illinois   60603
Telephone: (312) 332-2891
Facsimile: (312) 750-1595
Email: profaaa@aol.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that in accordance with the Seventh

Circuit CM/ECF System, undersigned electronically forwarded the foregoing

Opening Appellant's Brief and required Appendix to the Office of the United

State's Attorney in Chicago and the Clerk of the U.S. Court of Appeal for the

Seventh Circuit the attached documents:

     **1.**     **Larry Jones' Opening Brief with Required Appendix for
the Defendant-Appellant in No. 23-2557.**

Dated: September 25, 2024        By:   /s/Allan A. Ackerman
                                      ALLAN A. ACKERMAN

NO.  23-2557

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

---

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

vs.

LARRY JONES,
Defendant-Appellant.

---

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:20-CR-00309-1

Honorable. Virginia M. Kendall, Judge Presiding.

---

REQUIRED SHORT APPENDIX OF DEFENDANT-APPELLANT,
LARRY JONES

---

ALLAN A. ACKERMAN
Attorney at Law
Counsel of Record
19 S. LaSalle Street, Suite 502
Chicago, Illinois  60603
Telephone:  312- 332-2891
Facsimile:  312-750-1595
Email: profaaa@aol.com

Counsel for Larry Jones
Defendant-Appellant

CERTIFICATE OF COMPLIANCE WITH FRAP RULE 32(a)(7)(C)

The undersigned certifies that this brief complies with the volume

limitations of Federal Rule of Appellate Procedure 32(a)(7)(C) and Circuit Rule

32 in that it contains 11,801 words as shown by Word Perfect 12 used in preparing

this brief.

/s/ Allan A. Ackerman
Counsel for Larry Jones
Defendant-Appellant

Dated: September 25, 2024

CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30

The undersigned, counsel for Defendant-Appellant, hereby states that all of the materials required by Circuit Rule 30(a) and 30(b) are included in the Appendix to this brief.

/s/ Allan A. Ackerman
Counsel for Larry Jones
Defendant-Appellant

Dated: September 25, 2024

INDEX TO

APPENDICES TO APPELLANT'S OPENING BRIEF

App. 1-12     Indictment 20 CR 309 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  R. 1

App. 13       Minute Order, Defendant's Guilty Plea. . . . . . . . . . . . . . . . . . .  R. 173

App. 14-33   Defendant's Plea Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . .  R. 174

App. 34-46   Defendant's Sentencing Memo . . . . . . . . . . . . . . . . . . . . . . . . .  R. 184

App. 47-59   Government Sentencing Memo . . . . . . . . . . . . . . . . . . . . . . . . .  R. 196

App. 60-62   Defendant's Objections to Government Sentencing Memo . . .  R. 198

App. 63-65   ROP. 7/20/23 at Tr. 202-204; partial findings by sentencing court.

App. 66-67   ROP. 7/20/23 at Tr. 215-216; sentencing court partial findings.

App. 68-73   ROP. 7/20/23 at Tr. 244-249; sentencing court partial findings.

App. 74       Minute Order concerning sentencing completion . . . . . . . . . . .  R. 205

App. 75-82   Judgement and Commitment Order for Larry Jones . . . . . . . . .  R. 206

FILED

JUN 2 4 2020 *W*

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RECEIVED

JUL 2 4 2020

Magistrate Judge Beth W. Jantz
United States District Court

UNITED STATES OF AMERICA          )
                                  )          No.
          v.                      )
                                  )          Violations: Title 18, United States
LARRY JONES,                      )          Code, Section 1956(a)(3)(A); and
     a/k/a "Lil Larry,"           )          Title 21, United States Code,
MARSHA FOUNTAIN, and              )          Sections 841(a)(1) and 846
JAMAR SPENCER,                    )
     a/k/a "Red," "Freckles"      )          **Under Seal**

**JUDGE KENDALL**

COUNT ONE

**MAGISTRATE JUDGE VALDEZ**

The SPECIAL JANUARY 2019 GRAND JURY charges:

1.     Beginning on or about August 6, 2018, and continuing until on or about

September 3, 2019, at Chicago, in the Northern District of Illinois, Eastern Division,

and elsewhere,

LARRY JONES, a/k/a "Lil Larry,"
MARSHA FOUNTAIN, and
JAMAR SPENCER, a/k/a "Red," "Freckles,"

defendants herein, did conspire with each other, and with others known and unknown

to the Grand Jury, to knowingly and intentionally possess with intent to distribute

and distribute a controlled substance, namely, a quantity of a mixture and substance

containing a detectable amount of heroin, a Schedule I Controlled Substance, in

violation of Title 21, United States Code, Section 841(a)(1);

In violation of Title 21, United States Code, Section 846.

1

2.    With respect to LARRY JONES, the offense involved 100 grams or more of a mixture and substance containing a detectable amount of heroin, a Schedule I Controlled Substance.

3.    Before LARRY JONES committed the offense charged in this count, LARRY JONES had a final conviction for a serious violent felony, namely, a conviction in Case Number 97 CR 1538201 (Circuit Court of Cook County, Illinois) for attempted murder, in violation of 720 ILCS 5/9-1(a)(1), for which he served more than 12 months of imprisonment.

4.    Before JAMAR SPENCER committed the offense charged in this count, JAMAR SPENCER had a final conviction for a serious drug felony, namely, a conviction in Case Number 06 CR 1750401 (Circuit Court of Cook County, Illinois), for manufacture or delivery of a controlled substance, in violation of 720 ILCS 570/401, for which he served a term of imprisonment of more than 12 months and for which he was released from serving any term of imprisonment related to that offense within 15 years of the commencement of the instant offense.

2

## COUNT TWO

The SPECIAL JANUARY 2019 GRAND JURY further charges:

On or about August 6, 2018, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

LARRY JONES, a/k/a "Lil Larry," and
MARSHA FOUNTAIN,

defendants herein, did knowingly and intentionally distribute a controlled substance, namely, a quantity of a mixture and substance containing a detectable amount of heroin, a Schedule I Controlled Substance;

In violation of Title 21, United States Code, Section 841(a)(1), and Title 18, United States Code, Section 2.

3

## COUNT THREE

The SPECIAL JANUARY 2019 GRAND JURY further charges:

On or about August 6, 2018, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

### LARRY JONES, a/k/a "Lil Larry,"

defendant herein, with intent to promote the carrying on of specified unlawful activity, did knowingly conduct and attempt to conduct a financial transaction affecting interstate and foreign commerce, involving property represented by a confidential source to be proceeds of specific unlawful activity, namely, the felonious buying and selling and otherwise dealing in a controlled substance;

In violation of Title 18, United States Code, Section 1956(a)(3)(A).

4

## COUNT FOUR

The SPECIAL JANUARY 2019 GRAND JURY further charges:

On or about August 15, 2018, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

### LARRY JONES, a/k/a "Lil Larry,"

defendant herein, did knowingly and intentionally distribute a controlled substance, namely, a quantity of a mixture and substance containing a detectable amount of heroin, a Schedule I Controlled Substance;

In violation of Title 21, United States Code, Section 841(a)(1), and Title 18, United States Code, Section 2.

5

App. 5

## COUNT FIVE

The SPECIAL JANUARY 2019 GRAND JURY further charges:

On or about September 19, 2018, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

### LARRY JONES, a/k/a "Lil Larry,"

defendant herein, did knowingly and intentionally distribute a controlled substance, namely, a quantity of a mixture and substance containing a detectable amount of heroin, a Schedule I Controlled Substance;

In violation of Title 21, United States Code, Section 841(a)(1).

6

App. 6

## COUNT SIX

The SPECIAL JANUARY 2019 GRAND JURY further charges:

1.    On or about October 24, 2018, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

LARRY JONES, a/k/a "Lil Larry," and
JAMAR SPENCER, a/k/a "Red," "Freckles,"

defendants herein, did knowingly and intentionally distribute a controlled substance, namely, a quantity of a mixture and substance containing a detectable amount of heroin, a Schedule I Controlled Substance;

In violation of Title 21, United States Code, Section 841(a)(1), and Title 18, United States Code, Section 2.

2.    Before JAMAR SPENCER committed the offense charged in this count, JAMAR SPENCER had a final conviction for a serious drug felony, namely, a conviction in Case Number 06 CR 1750401 (Circuit Court of Cook County, Illinois), for manufacture or delivery of a controlled substance, in violation of 720 ILCS 570/401, for which he served a term of imprisonment of more than 12 months and for which he was released from serving any term of imprisonment related to that offense within 15 years of the commencement of the instant offense.

7

App. 7

## COUNT SEVEN

The SPECIAL JANUARY 2019 GRAND JURY further charges:

On or about December 18, 2018, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

### LARRY JONES, a/k/a "Lil Larry,"

defendant herein, did knowingly and intentionally distribute a controlled substance, namely, a quantity of a mixture and substance containing a detectable amount of heroin, a Schedule I Controlled Substance;

In violation of Title 21, United States Code, Section 841(a)(1).

8

## COUNT EIGHT

The SPECIAL JANUARY 2019 GRAND JURY further charges:

1.     On or about February 20, 2019, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

LARRY JONES, a/k/a "Lil Larry,"

defendant herein, did knowingly and intentionally distribute a controlled substance, namely, a quantity of a mixture and substance containing a detectable amount of heroin, a Schedule I Controlled Substance;

In violation of Title 21, United States Code, Section 841(a)(1).

2.     Before LARRY JONES committed the offense charged in this count, LARRY JONES had a final conviction for a serious violent felony, namely, a conviction in Case Number 97 CR 1538201 (Circuit Court of Cook County, Illinois) for attempted murder, in violation of 720 ILCS 5/9-1(a)(1), for which he served more than 12 months of imprisonment.

9

App. 9

## COUNT NINE

The SPECIAL JANUARY 2019 GRAND JURY further charges:

1.    On or about September 3, 2019, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

LARRY JONES, a/k/a "Lil Larry," and<br>
MARSHA FOUNTAIN,

defendants herein, did knowingly and intentionally distribute a controlled substance, namely, a quantity of a mixture and substance containing a detectable amount of heroin, a Schedule I Controlled Substance;

In violation of Title 21, United States Code, Section 841(a)(1), and Title 18, United States Code, Section 2.

2.    Before LARRY JONES committed the offense charged in this count, LARRY JONES had a final conviction for a serious violent felony, namely, a conviction in Case Number 97 CR 1538201 (Circuit Court of Cook County, Illinois) for attempted murder, in violation of 720 ILCS 5/9-1(a)(1), for which he served more than 12 months of imprisonment.

10

App. 10

## FORFEITURE ALLEGATION

The SPECIAL JANUARY 2019 GRAND JURY further alleges:

1.      Upon conviction of an offense in violation of Title 21, United States Code, Sections 841(a)(1) and 846, as set forth in this Indictment, defendants shall forfeit to the United States of America any property which constitutes and is derived from proceeds obtained, directly and indirectly, as a result of the offense; and any property used, and intended to be used, in any manner and part, to commit and facilitate commission of the offense, as provided in Title 21, United States Code, Section 853(a).

2.      Upon conviction of an offense in violation of Title 18, United States Code, Section 1956, as set forth in this Indictment, defendant LARRY JONES shall forfeit to the United States of America any property involved in such offense, and any property traceable to such property, as provided in Title 18, United States Code, Section 982(a)(1).

3.      If any of the property described above, as a result of any act or omission by defendant: cannot be located upon the exercise of due diligence; has been transferred or sold to, or deposited with, a third party; has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty, the

11

App. 11

United States of America shall be entitled to forfeiture of substitute property, as provided in Title 21, United States Code, Section 853(p).

A TRUE BILL:

_____
FOREPERSON

_____
UNITED STATES ATTORNEY

12

Case: 1:20-cr-00309 Document #: 173 Filed: 01/19/23 Page 1 of 1 PageID #:735

IN THE UNITED STATES DISTRICT COURT
FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

United States of America

,

Plaintiff(s),

                                    Case No.  20 CR 309-1

v.                                    Judge  Virginia M. Kendall

Larry Jones,

Defendant(s).

## ORDER

ORDER as to Larry Jones: Change of plea hearing held. Defendant enters plea of guilty to
Counts 1 and 3 of the Indictment. The Court accepts a plea of guilty and enters Judgment. Enter
Plea Agreement. Cause referred to the Probation Office for a presentence investigation.
Sentencing set for 4/21/2023 at 12:30 p.m. Sentencing position papers due on or before
4/7/2023. The Court directs the disclosure of the Probation Department's sentencing
recommendation to both Defendant and the Government. For the reasons as stated in open Court,
Defendant's oral motion to remain out of custody is denied.  Defendant is ordered detained and
remanded into federal custody. Pursuant to 18 U.S.C. § 3664(d)(1), if restitution is being sought
in this case, 60 days prior to the sentencing date, the Government shall provide the Probation
Office and the courtroom deputy an electronic standardized spreadsheet (available on the Court's
website) with a list of victims and their full current contact information. This list shall include
any amounts subject to restitution. If the Government is not able to provide the full victim list 60
days prior to sentencing, they shall file a motion to request an extension of time to compile the
information, to the extent permitted by 18 U.S.C. § 3664(d)(5).
(0:45)

Date:  1/19/2023                         /s/ Virginia M. Kendall
                                        United States District Judge



FILED
1/19/2023
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

v.

LARRY JONES

No. 20 CR 309-1

Judge Virginia M. Kendall

### PLEA AGREEMENT

1.  This Plea Agreement between the United States Attorney for the Northern District of Illinois, JOHN R. LAUSCH, JR., and defendant LARRY JONES, and his attorney, PHILLIP TURNER, is made pursuant to Rule 11 of the Federal Rules of Criminal Procedure and is governed in part by Rule 11(c)(1)(A), as more fully set forth below. The parties to this Agreement have agreed upon the following:

### Charges in This Case

2.  The indictment in this case charges defendant with conspiracy to possess with intent to distribute a controlled substance, namely, 100 grams or more of heroin, in violation of Title 21, United States Code, Section 846 (Count 1); money laundering, in violation of Title 18, United States Code, Section 1956(a)(3)(A) (Count 3); and distributing a controlled substance, namely, a quantity of heroin, in violation of Title 21, United States Code, Section 841(a)(1) (Counts 2 and 4-9).

3.  Defendant has read the charges against him contained in the indictment, and those charges have been fully explained to him by his attorney.

App. 14

4.      Defendant fully understands the nature and elements of the crimes with which he has been charged.

## Charge to Which Defendant Is Pleading Guilty

5.      By this Plea Agreement, defendant agrees to enter a voluntary plea of guilty to the following count of the indictment: Count 1, which charges defendant with conspiracy to possess with intent to distribute and distribute a controlled substance, namely, 100 grams or more of a mixture and substance containing a detectable amount of heroin, a Schedule I Controlled Substance, in violation of Title 21, United States Code, Section 846; and Count 3, which charges defendant with knowingly conducting and attempting to conduct a financial transaction affecting interstate commerce, involving property represented by a confidential source to be the proceeds of specific unlawful activity, namely, the felonious buying and selling and otherwise dealing in a controlled substance with the intent to promote the carrying on of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(3)(A).

## Factual Basis

6.      Defendant will plead guilty because he is in fact guilty of the charges contained in Counts 1 and 3 of the indictment. In pleading guilty, defendant admits the following facts and that those facts establish his guilt beyond a reasonable doubt and constitute relevant conduct under Guideline 1B1.3:

2

App. 15

Count One

Beginning on or about August 6, 2018, and continuing until on or about September 3, 2019, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, defendant LARRY JONES conspired with co-defendants Jamar Spencer and Marsha Fountain, and with others known and unknown, to knowingly and intentionally possess with intent to distribute and distribute a controlled substance, namely, 100 grams or more of a mixture and substance containing a detectable amount of heroin, a Schedule I Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1), in violation of Title 21, United States Code, Section 846.

Specifically, between approximately August 2018 and September 2019, JONES worked with Marsha Fountain, Jamar Spencer, and others to sell quantities of heroin in and around Chicago, Illinois. During this time, JONES directed Fountain to do the following: store wholesale quantities of heroin; transport heroin to JONES and his associates; collect narcotics proceeds from Spencer and others who sold heroin supplied by JONES; and provide JONES with information she received from street level sellers and customers about the quality of the heroin that JONES supplied.

For example, on or about August 6, 2018, JONES placed a call to Fountain and instructed her to bring him approximately 25 grams of heroin for JONES to sell to a customer who, unbeknownst to JONES and Fountain, was a confidential source ("CS-1") cooperating with law enforcement. Later that day, Fountain met with JONES and

3

App. 16

the CS in a vehicle parked on the 400 block of South Cicero Avenue in Chicago. During that meeting, JONES cautioned Fountain about the presence of law enforcement in the area and asked Fountain if she brought "25 or 50" grams of heroin to the meeting. Fountain responded that she brought "25," which JONES understood to mean 25 grams of heroin. Fountain then handed a knotted plastic bag containing approximately 25 grams of heroin to JONES, and JONES then distributed the heroin to CS-1 in exchange for $3,750. JONES acknowledges that $1,875 of the $3,750 paid by CS-1 to JONES was repayment for approximately 25 grams of heroin that JONES "fronted" to CS-1 on or about July 23, 2018.

JONES also sometimes directed Spencer to distribute heroin directly to JONES's customers. For example, on October 24, 2018, JONES directed Spencer to travel to the 3800 block of West Lake Street in Chicago to meet with CS-1. During that meeting, Spencer gave CS-1 approximately 24.8 grams of heroin and received approximately $1,880 in narcotics proceeds from CS-1, which Spencer then gave to JONES.

Finally, JONES acknowledges that, in addition to the August 6 and October 24, 2018, transactions described above, JONES distributed the following quantities of heroin to CS-1: on or about August 15, 2018, JONES distributed approximately 24.8 grams of heroin to CS-1; on or about September 19, 2018, JONES distributed approximately 25 grams of heroin to CS-1; on or about December 18, 2018, JONES distributed approximately 24.9 grams of heroin to CS-1; on or about February 20,

4

2019, JONES distributed approximately 25 grams of heroin to CS-1; and on or about September 3, 2019, JONES distributed approximately 24.5 grams of heroin to CS-1. JONES acknowledges that he received $9,385 in connection with those transactions listed above.

JONES further acknowledges that, for the purpose of computing his sentence under the Sentencing Guidelines, the following conduct that he stipulates constitutes relevant conduct under Guideline § 1B1.3. Specifically, JONES acknowledges that he met Spencer in the early 2000s and that, in addition to heroin, JONES also sold quantifies of marijuana, cocaine base, and fentanyl to Spencer during the course of their relationship.

Count Three

On or about August 6, 2018, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, JONES, with intent to promote the carrying on of specified unlawful activity, did knowingly conduct and attempt to conduct a financial transaction affecting interstate and foreign commerce, involving property represented by the CS to be proceeds of specific unlawful activity, namely, the felonious buying and selling and otherwise dealing in a controlled substance, in violation of Title 18, United States Code, Section 1956(a)(3)(A).

Specifically, on August 6, 2018, during the narcotics transaction between the CS and JONES described above, JONES received approximately $3,750 in payment from the CS. JONES acknowledges that approximately $1,875 of that total

5

represented payment to JONES for narcotics previously supplied by JONES to the CS on or about July 23, 2018. JONES further acknowledges that he accepted payment for the purpose of promoting and maintaining his drug dealing relationship with the CS.

## Maximum Statutory Penalties

7.     Defendant understands that the charge to which he is pleading guilty carries the following statutory penalties:

a.     Count One carries a maximum sentence of 40 years' imprisonment, and a statutory mandatory minimum sentence of five years' imprisonment. Pursuant to Title 18, United States Code, Section 3561, defendant may not be sentenced to a term of probation for this offense. This offense also carries a maximum fine of $5,000,000. Defendant further understands that the judge also must impose a term of supervised release of at least four years, and up to any number of years, including life.

b.     Count Three carries a maximum sentence of 20 years' imprisonment. Count Three also carries a maximum fine of $500,000, or twice the value of the monetary instrument or funds involved in the offense, whichever is greater. Defendant further understands that with respect to Count Three, the judge also may impose a term of supervised release of not more than three years.

6

     c.     Pursuant to Title 18, United States Code, Section 3013, defendant will be assessed $100 on the charge to which he has pled guilty, in addition to any other penalty imposed.

     d.     Therefore, under the counts to which defendant is pleading guilty, the total maximum sentence is 60 years' imprisonment. In addition, defendant is subject to a total maximum fine of $5,500,000, or twice the value of the monetary instrument or funds involved in the offense, whichever is greater, a period of supervised release, and special assessments totaling $200.

### Sentencing Guidelines Calculations

8.     Defendant understands that in determining a sentence, the Court is obligated to calculate the applicable Sentencing Guidelines range, and to consider that range, possible departures under the Sentencing Guidelines, and other sentencing factors under 18 U.S.C. § 3553(a), which include: (i) the nature and circumstances of the offense and the history and characteristics of the defendant; (ii) the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense, afford adequate deterrence to criminal conduct, protect the public from further crimes of the defendant, and provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (iii) the kinds of sentences available; (iv) the need to avoid unwarranted sentence disparities

7

among defendants with similar records who have been found guilty of similar conduct; and (v) the need to provide restitution to any victim of the offense.

9. For purposes of calculating the Sentencing Guidelines, the parties agree on the following points:

a. **Applicable Guidelines**. The Sentencing Guidelines to be considered in this case are those in effect at the time of sentencing. The following statements regarding the calculation of the Sentencing Guidelines are based on the Guidelines Manual currently in effect, namely the November 2021 Guidelines Manual.

b. **Offense Level Calculations**.

i. Count One and Relevant Conduct

1. It is the government's position that the amount of controlled substances involved in the offense of conviction and relevant conduct for which defendant is accountable, or which was reasonably foreseeable to the defendant, and relevant conduct is approximately 85 grams of cocaine base (the equivalent of 303.54 kilograms of Converted Drug Weight, pursuant to Guideline § 2D1.1, application note 8(D)); 160 to 200 grams of fentanyl (the equivalent of 400 to 500 kilograms of Converted Drug Weight, pursuant to Guideline § 2D1.1, application note 8(D)); 5.57 to 6.04 kilograms of heroin (the equivalent of 5,570 to 6,040 kilograms of Converted Drug Weight, pursuant to Guideline § 2D1.1, application note 8(D)); and 12.71 kilograms of marijuana (the equivalent of 12.71 kilograms of Converted Drug

8

Weight, pursuant to Guideline § 2D1.1, application note 8(D). Pursuant to Application Note 8(B) to Guidelines § 2D1.1, when determining the offense level for an offense involving different controlled substances, each drug is to be converted to its converted drug weight, combined, and then referred to the Drug Quantity Table in § 2D1.1 to obtain the combined offense level. It is the government's position that the combined Converted Drug Weight for the cocaine base, fentanyl, heroin, and marijuana for which defendant is accountable equals approximately 6,286.25 to 6,856.25 kilograms of Converted Drug Weight, which, pursuant to Guideline §§ 2D1.1(a)(5) and (c)(4), results in a base offense level of 32, because it is greater than 3,000 kilograms, but less than 10,000 kilograms of Converted Drug Weight. The defendant disagrees with the government's position and reserves the right to argue for a different total drug quantity calculation.

      2.    Pursuant to Guideline § 3B1.1(c), the offense level is increased by 2 levels, because defendant was an organizer, leader, manager, or supervisor in the conspiracy.

      3.    Accordingly, it is the government's position that the total offense level for Count One is 34.

    ii.    Count Three

      1.    The government's position is that, pursuant to Guideline §§ 2S1.1(a)(1), the base offense level is 34, because the defendant

9

App. 22

committed the underlying offense and the offense level for that offense can be determined.

        2.     Pursuant to Guideline § 2S1.1(b)(2)(B), the offense level is increased by 2 levels because the defendant was convicted under Title 18, United States Code, Section 1956(a)(3)(A).

        3.     Therefore, the government's position is that the total offense level for Count Three is 36.

        iii.     Grouping

        1.     Pursuant to § 3D1.2(c), Count One and Count Three are grouped together because one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts.

        2.     Therefore, the government's position is that the defendant's total offense level is 36.

        iv.     If by the time of sentencing the defendant has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for his criminal conduct within the meaning of Guideline § 3E1.1(a), defendant should receive a two-level reduction in the offense level. At the present time, the government reserves its position on this adjustment until the time of sentencing.

        v.     Defendant timely notified the government of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for

10

trial and permitting the Court to allocate its resources efficiently, within the meaning of Guideline § 3E1.1(b). Accordingly, at the time of defendant's sentencing hearing, the government will move for an additional 1-level reduction if the Court determines that defendant has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for his criminal conduct within the meaning of Guideline § 3E1.1(a).

      c.    **Criminal History Category**. With regard to determining defendant's criminal history points and criminal history category, based on the facts now known to the government and stipulated below, defendant's criminal history points equal 0 and defendant's criminal history category is I:

      i.    On or about April 6, 1998, defendant was convicted of attempted murder in the Circuit Court of Cook County, Illinois (Case No. 97 CR 1538201), and received a sentence of 9 years' imprisonment, which was amended to 8 years' imprisonment on or about August 17, 2000. Pursuant to Guideline § 4A1.2(e)(3), defendant receives zero criminal history points for this sentence.

      ii.    On or about February 18, 2003, defendant was convicted of possession of a controlled substance in the Circuit Court of Cook County, Illinois (Case No. 02 CR 2338801), and received a sentence of 2 years' imprisonment. Pursuant to Guideline § 4A1.2(e)(3), defendant receives zero criminal history points for this sentence.

11

App. 24

d. **Anticipated Advisory Sentencing Guidelines Range.**
Therefore, based on the facts now known to the government, it is the government's position that if the Court determines that defendant has not clearly demonstrated a recognition and affirmative acceptance of personal responsibility for his criminal conduct with the meaning of Guideline § 3E1.1, the anticipated offense level is 36 which, when combined with the anticipated criminal history category of I, results in an anticipated advisory sentencing guidelines range of 188 to 235 months' imprisonment, in addition to any supervised release and fine the Court may impose. While Defendant reserves the right to argue for a different Guidelines calculation at the time of sentencing, defendant acknowledges that he is subject to a statutory minimum sentence of five years' imprisonment.

e. Defendant and his attorney and the government acknowledge that the above guidelines calculations are preliminary in nature, and are non-binding predictions upon which neither party is entitled to rely. Defendant understands that further review of the facts or applicable legal principles may lead the government to conclude that different or additional guidelines provisions apply in this case. Defendant understands that the Probation Office will conduct its own investigation and that the Court ultimately determines the facts and law relevant to sentencing, and that the Court's determinations govern the final guideline calculation. Accordingly, the validity of this Agreement is not contingent upon the probation officer's or the Court's concurrence with the above calculations, and defendant shall

12

not have a right to withdraw his plea on the basis of the Court's rejection of these calculations.

f. Both parties expressly acknowledge that this Agreement is not governed by Fed. R. Crim. P. 11(c)(1)(B), and that errors in applying or interpreting any of the sentencing guidelines may be corrected by either party prior to sentencing. The parties may correct these errors either by stipulation or by a statement to the Probation Office or the Court, setting forth the disagreement regarding the applicable provisions of the guidelines. The validity of this Agreement will not be affected by such corrections, and defendant shall not have a right to withdraw his plea, nor the government the right to vacate this Agreement, on the basis of such corrections.

### Agreements Relating to Sentencing

10. Each party is free to recommend whatever sentence it deems appropriate.

11. It is understood by the parties that the sentencing judge is neither a party to nor bound by this Agreement and may impose a sentence up to the maximum penalties as set forth above. Defendant further acknowledges that if the Court does not accept the sentencing recommendation of the parties, defendant will have no right to withdraw his guilty plea.

12. Defendant agrees to pay the special assessment of $100 at the time of sentencing with a cashier's check or money order payable to the Clerk of the U.S. District Court.

13

13.     The parties further agree, pursuant to Title 18, United States Code, Section 3583(d), that the sentence to be imposed by the Court shall include, as a condition of any term of supervised release or probation imposed in this case, a requirement that defendant repay the United States approximately $15,015 as compensation for government funds that defendant received during the investigation of the case.

14.     Defendant agrees that the United States may enforce collection of any fine or restitution imposed in this case pursuant to Title 18, United States Code, Sections 3572, 3613, and 3664(m), notwithstanding any payment schedule set by the Court.

15.     Before sentence is imposed, the government will move to dismiss the notice of prior conviction relating to defendant filed pursuant to Title 21, United States Code, Section 851.

16.     After sentence has been imposed on the counts to which defendant pleads guilty as agreed herein, the government will move to dismiss the remaining counts of the indictment as to defendant, including the forfeiture allegation.

### Acknowledgments and Waivers Regarding Plea of Guilty

### Nature of Agreement

17.     This Agreement is entirely voluntary and represents the entire agreement between the United States Attorney and defendant regarding defendant's criminal liability in case 20 CR 309-1.

14

App. 27

18.    This Agreement concerns criminal liability only. Except as expressly set forth in this Agreement, nothing herein shall constitute a limitation, waiver, or release by the United States or any of its agencies of any administrative or judicial civil claim, demand, or cause of action it may have against defendant or any other person or entity. The obligations of this Agreement are limited to the United States Attorney's Office for the Northern District of Illinois and cannot bind any other federal, state, or local prosecuting, administrative, or regulatory authorities, except as expressly set forth in this Agreement.

### Waiver of Rights

19.    Defendant understands that by pleading guilty he surrenders certain rights, including the following:

a.    **Trial rights**. Defendant has the right to persist in a plea of not guilty to the charges against him, and if he does, he would have the right to a public and speedy trial.

i.    The trial could be either a jury trial or a trial by the judge sitting without a jury. However, in order that the trial be conducted by the judge sitting without a jury, defendant, the government, and the judge all must agree that the trial be conducted by the judge without a jury.

ii.    If the trial is a jury trial, the jury would be composed of twelve citizens from the district, selected at random. Defendant and his attorney would participate in choosing the jury by requesting that the Court remove

15

prospective jurors for cause where actual bias or other disqualification is shown, or by removing prospective jurors without cause by exercising peremptory challenges.

   iii.  If the trial is a jury trial, the jury would be instructed that defendant is presumed innocent, that the government has the burden of proving defendant guilty beyond a reasonable doubt, and that the jury could not convict him unless, after hearing all the evidence, it was persuaded of his guilt beyond a reasonable doubt and that it was to consider each count of the indictment separately. The jury would have to agree unanimously as to each count before it could return a verdict of guilty or not guilty as to that count.

   iv.  If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all the evidence, and considering each count separately, whether or not the judge was persuaded that the government had established defendant's guilt beyond a reasonable doubt.

   v.  At a trial, whether by a jury or a judge, the government would be required to present its witnesses and other evidence against defendant. Defendant would be able to confront those government witnesses and his attorney would be able to cross-examine them.

   vi.  At a trial, defendant could present witnesses and other evidence in his own behalf. If the witnesses for defendant would not appear voluntarily, he could require their attendance through the subpoena power of the Court. A defendant is not required to present any evidence.

16

vii.    At a trial, defendant would have a privilege against self-incrimination so that he could decline to testify, and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify in his own behalf.

b.    **Waiver of appellate rights.** Defendant further understands he is waiving all appellate issues that might have been available if he had exercised his right to trial, and may only appeal the validity of this plea of guilty and the sentence imposed. Defendant understands that any appeal must be filed within 14 calendar days of the entry of the judgment of conviction.

20.    Defendant understands that by pleading guilty he is waiving all the rights set forth in the prior paragraphs. Defendant's attorney has explained those rights to him, and the consequences of his waiver of those rights.

### Presentence Investigation Report/Post-Sentence Supervision

21.    Defendant understands that the United States Attorney's Office in its submission to the Probation Office as part of the Pre-Sentence Report and at sentencing shall fully apprise the District Court and the Probation Office of the nature, scope, and extent of defendant's conduct regarding the charges against him, and related matters. The government will make known all matters in aggravation and mitigation relevant to sentencing, including the nature and extent of defendant's cooperation.

17

22. Defendant agrees to truthfully and completely execute a Financial Statement (with supporting documentation) prior to sentencing, to be provided to and shared among the Court, the Probation Office, and the United States Attorney's Office regarding all details of his financial circumstances, including his recent income tax returns as specified by the probation officer. Defendant understands that providing false or incomplete information, or refusing to provide this information, may be used as a basis for denial of a reduction for acceptance of responsibility pursuant to Guideline § 3E1.1 and enhancement of his sentence for obstruction of justice under Guideline § 3C1.1, and may be prosecuted as a violation of Title 18, United States Code, Section 1001 or as a contempt of the Court.

23. For the purpose of monitoring defendant's compliance with his obligations to pay a fine during any term of supervised release or probation to which defendant is sentenced, defendant further consents to the disclosure by the IRS to the Probation Office and the United States Attorney's Office of defendant's individual income tax returns (together with extensions, correspondence, and other tax information) filed subsequent to defendant's sentencing, to and including the final year of any period of supervised release or probation to which defendant is sentenced. Defendant also agrees that a certified copy of this Agreement shall be sufficient evidence of defendant's request to the IRS to disclose the returns and return information, as provided for in Title 26, United States Code, Section 6103(b).

18

### Other Terms

24.     Defendant agrees to cooperate with the United States Attorney's Office in collecting any unpaid fine for which defendant is liable, including providing financial statements and supporting records as requested by the United States Attorney's Office.

25.     Defendant understands that, if convicted, a defendant who is not a United States citizen may be removed from the United States, denied citizenship, and denied admission to the United States in the future.

### Conclusion

26.     Defendant understands that this Agreement will be filed with the Court, will become a matter of public record, and may be disclosed to any person.

27.     Defendant understands that his compliance with each part of this Agreement extends throughout the period of his sentence, and failure to abide by any term of the Agreement is a violation of the Agreement. Defendant further understands that in the event he violates this Agreement, the government, at its option, may move to vacate the Agreement, rendering it null and void, and thereafter prosecute defendant not subject to any of the limits set forth in this Agreement, or may move to resentence defendant or require defendant's specific performance of this Agreement. Defendant understands and agrees that in the event that the Court permits defendant to withdraw from this Agreement, or defendant breaches any of its terms and the government elects to void the Agreement and prosecute defendant,

19

any prosecutions that are not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against defendant in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement of such prosecutions.

28.     Should the judge refuse to accept defendant's plea of guilty, this Agreement shall become null and void and neither party will be bound to it.

29.     Defendant and his attorney acknowledge that no threats, promises, or representations have been made, nor agreements reached, other than those set forth in this Agreement, to cause defendant to plead guilty.

30.     Defendant acknowledges that he has read this Agreement and carefully reviewed each provision with his attorney. Defendant further acknowledges that he understands and voluntarily accepts each and every term and condition of this Agreement.

AGREED THIS DATE: _____ /-19-25

ERIKA
CSICSILA
Digitally signed by ERIKA CSICSILA
Date: 2022.12.15 12:29:01 -06'00'

Erika L. Csicsila on behalf of
JOHN R. LAUSCH, JR.
United States Attorney

JIMMY ARCE
Digitally signed by JIMMY ARCE
Date: 2023.01.18 15:44:19 -06'00'

JIMMY L. ARCE
Assistant U.S. Attorney

LARRY JONES
Defendant

PHILLIP TURNER
Attorney for Defendant

20

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | NO.  20 CR 309 |
| LARRY JONES, | ) | |
| | ) | Judge Virginia M. Kendall |
| Defendant. | ) | |

## DEFENDANT LARRY JONES' SENTENCING MEMORANDUM

Larry Jones, by his attorney, Phillip A. Turner, respectfully submits the following as his sentencing memorandum in this matter so that an appropriate sentence considering Title 18 United States Code, Section 3553(a) is imposed.

Larry Jones has pled guilty to conspiracy to possess with intent to distribute heroin and money laundering.  In this case, Larry Jones is subject to five-year mandatory minimum sentence.  Larry Jones was taken into federal custody after he pled guilty on January 19, 2023.  He is in custody at the Jerome Combs Detention Center for Kankakee County.

As this Court is aware, in **United States v. Booker,** 543 U.S. 220 (2005), the United States Supreme Court held that the mandatory application of the

Case: 1:20-cr-00209 Document #: 184 Filed: 04/07/23 Page 2 of 13 PageID #:967

United States Sentencing Guidelines was unconstitutional and that the guidelines were advisory. The guidelines are only part of the analysis pursuant to Title 18 United States Code, Section 3553(a) which directs a sentencing court to impose a sentence which is "sufficient, but not greater than necessary." In addition, the Seventh Circuit Court of Appeals has remarked that the departure methodology is obsolete in light of **Booker**. See, **United States v. Laufle,** 433 F.3d 981, 986 (7th Cir. 2006). The Seventh Circuit has expanded upon the analysis which is to be undertaken in applying the Section 3553 factors. In **United States v. Warner**, 792 F.3d 847 (7th Cir. 2015), the Seventh Circuit of Appeals reviewed the propriety of a sentence of probation for an extremely wealthy man who had by sophisticated and fraudulent means evaded $5.6 million in United States taxes by hiding approximately $107 million in taxable income in secret Swiss bank accounts. The existence of the Swiss bank accounts and the funds contained in those accounts were hidden from the United States Department of Treasury, Internal Revenue Service. In addition to hiding the money, defendant Warner instructed his Swiss bankers not to send him any correspondence and to destroy all the account records. When the United States government concluded an agreement with one of the Swiss banks which would have revealed defendant Warner's secret Swiss account, he

transferred the funds to another Swiss bank and used a Liechtenstein shell entity to hide his ownership of the funds. Warner perpetrated this tax evasion scheme for approximately 12 years. When the United States Department of Justice began to investigate and prosecute this type of offshore tax evasion, a grand jury subpoena was served on Warner for the records of his offshore banking records. Warner resisted and fought the grand jury subpoena; however, he was ultimately ordered by the courts to comply. **In re Special Feb. 2011-1 Grand Jury Subpoena Dates Sept. 12, 2011**, 691 F.3d 903, 909 (7th Cir. 2012), cert. denied, 133 S. Ct. 2338 (2013). Obviously, defendant Warner was very wealthy and had a privileged life with no explanation for his criminal conduct other than insatiable greed. Despite Warner's long term sophisticated, premeditated and egregious conduct, the government filed only a one-count felony information charging Warner with willful tax evasion in violation of 26 U.S.C. Section 7201. Defendant Warner had no prior convictions, and the resulting guidelines calculations yielded an advisory guideline range of 46 to 57 months imprisonment. At sentencing, the district court was appraised of the charitable causes to which defendant Warner had given money which of course, was easy for Warner to do. The district court sentenced defendant Warner to two years' probation with community service and a fine of

$100,000.00. The government appealed to the Seventh Circuit Court of Appeals arguing that the sentence was too lenient, and that defendant Warner should have been incarcerated. The Seventh Circuit Court of Appeals rejected the government's arguments and affirmed the sentence of probation. In the course of affirming the sentence of probation, the Seventh Circuit Court of Appeals engaged in an analysis of the significance of the sentencing guidelines and the sentencing factors set forth in Title 18 United States Code Section 3553. The Seventh Circuit initially noted that the crimes to which the defendant pleaded guilty did not expressly require the district court to send the defendant to prison. The Court of Appeals went on to state that in reviewing the Section 3553 factors "[a]fter **United States v. Booker**, however, the guidelines are merely advisory. 543 U.S. 220, 245 (2005)." The appellate court citing **Rita v. United States**, 551 U.S. 338, 351 (2007) and **Gall v. United States**, 552 U.S. 338, 351 (2007) indicated that the guidelines are to be considered, but not to be given much weight. "The open-endedness of the section 3553(a) factors leaves ample room for the court's discretion." Thus, the district court's imposition of a sentence of probation in the case of defendant Warner when all factors pointed to a sentence of incarceration was a proper exercise of the district court's discretion. In addition, **Gall v. United States**, 552 U.S. 38, 48 (2007)

recognized that probation represents a substantial restriction on an individual's liberty. The Supreme Court recounted that a probationer cannot move, change jobs, associate freely and generally has restricted freedom.

It is respectfully requested that the advisory guidelines be applied to Larry Jones with same thoughtfulness as they were applied to defendant Warner. Larry Jones acknowledges that he has been involved in selling illegal drugs. He acknowledged in the plea agreement that he, Jamar Spencer, and Marsha Fountain had other narcotics activity besides what is charged in this indictment. It is not to the extent that Jarmar Spencer is alleging. Counsel has requested from the government any books and records to corroborate Jamar Spencer's assertions. There are no records. In summary, this is a matter where three individuals, Larry Jones, Jamar Spencer, and Marsha Fountain agreed together, and worked together, to sell drugs. All three defendants were of equal stature in the matter doing what they needed to do to try to make money from the sale of heroin. Larry Jones knew a person he could call to get heroin. Marsha Fountain and Jamar Spencer knew how to mix drugs and had methods of distribution. Attached is the government's sentencing memorandum regarding defendant Marsha Fountain for comparison purposes. They did not make much money. Larry Jones is not

App. 38

trying to depreciate the seriousness of his offense or conduct, but he wants the court to know the truth.

Counsel has spent many hours speaking with Larry Jones so that counsel could convey to the court what Larry Jones wants said to the court even though he is unable to articulate the thoughts for himself.

Larry Jones acknowledges that he has a very serious prior record. As the court can discern from reviewing his history that he had no structure in his life as a child. His parents were involved in drugs and abandoned him when he was a child. The only constant adult in his life was his great grandmother. He grew up in an environment of drugs, violence, and poverty. The attempt murder case which Larry Jones had when he was 16 years old is an example of the early stages of his life. The case arose from an after-school confrontation between Larry Jones and his friends and another group of boys. Larry Jones and a boy in the rival group were fighting and struggling over a gun. The gun discharged in the struggle hitting the boy with who he was fighting and another boy. Another example is the brawl in which Larry Jones was involved which resulted in blindness in his left eye. This brawl occurred in 2003 when he was 23 years old. Again, Larry Jones was fighting with some other young men. One of the individuals came from behind him and hit him on the left side of his face near his left eye. Larry

Jones suffered nerve damage which caused him to become blind in his left eye.

Larry Jones has great difficulty reading and writing. Counsel has helped him read and understand the documents in this case. His son's mother helped him compose the letter which will be submitted to this court. He has not completed high school. He left school after the ninth grade. His reading and comprehension skills are not at a ninth-grade level. He was not promoted to the ninth grade because he had achieved the appropriate proficiency. Counsel has tried to obtain Larry Jones earlier school records which counsel hoped would contain an Individual Assessment Plan, commonly called an "IAP." Counsel was unable to obtain the elementary school records. While on home confinement, Larry Jones had a meaningful and legitimate job. He was proud of his work and himself. His son worked with him. It allowed him to give his son a positive example and spend time together doing something positive. However, while working, Larry Jones's lack of education hindered him in many ways. He had difficulty in communicating with people not from his community and with mathematical concepts. He has realized that he has many shortcomings. He is now very eager to finish high school and learn what he should have learned earlier. He would like to learn a trade so that he can support himself and be a

positive member of society. He understands that he has done wrong things in the past and he takes responsibility for what he has done. He desires to go forward and become a better person. Larry Jones agrees that he must be accountable for what he has done and that he must be punished. He intends to use his time in prison in a productive manner    I am attaching a copy of the letter from his last employer which was previously submitted to the court.     This case has had a great impact on Larry Jones. He has achieved some meaningful maturity. As the court is aware, since his arrest for this matter on June 25, 2020, he has been on home detention. When he had his job, he was allowed to go to work and to go to church on Sunday. His grandmother allowed him to stay at her house although she did not want him in her house.     He did not have any violations while on the home confinement. He thought about his life. He thought about what he has done and all that he has not done. He thought about the impact of his conduct on his family and his community.

OBJECTIONS TO PRESENTENCE REPORT

Defendant objects to the reference in paragraph 10, to the Black P. Stone street gang and the statement by Special Agent Paul Daou that Larry Jones is a "'high ranking and respected member'" of the Black P. Stone street gang. Larry Jones knows people in his neighborhood who are allegedly members

of the Black P. Stone gang. Larry Jones has never undergone the initiation procedure to become a member of that gang. Counsel for Larry Jones has requested from the government all documents which support this assertion of membership along with the assertion that Larry Jones is "high ranking" and a "respected" member. Counsel has not received anything from the government. Larry Jones requests that all references to Black P. Stones be removed from the pre-sentence report. The entire second sentence in paragraph 10 should be removed. This sort of allegation in the report will be viewed in a very negative light by the United States Bureau of Prisons (BOP) and could cause Larry Jones to serve his sentence in a much more restrictive BOP facility and result in Larry Jones being ineligible for various programs in the BOP. This comment and the resulting punitive actions by the BOP constitute a violation of due process.

Defendant objects to paragraph 11. Larry Jones agrees that he and the other individuals distributed 174 grams of heroin and that he had other transactions with the co-defendants. There are no records. Defendant Spencer had other sources of heroin as well as other drugs such as ecstasy, fentanyl, cocaine and marijuana. Larry Jones is not trying to depreciate the seriousness of his offense. The amounts of drugs as relative conduct are overstated. In addition, defendants Spencer and Fountain brought some

amounts fentanyl. They were knowledgeable as to how to mix the fentanyl with heroin. Larry Jones had a source of heroin and obtained the heroin for the transactions in the indictment.

Defendant objects to the reference to his proffer in 17. The government agreed that the proffer information would not be used in aggravation. Agent Daou is violating the proffer agreement by characterizing Larry Jones's proffer in a negative manner to aggravate Larry Jones's sentence. Larry Jones had no intention of telling anyone that he engaged in a proffer since the government informed him that his proffer was inadequate. This reference to his proffer may jeopardize Larry Jones's life and the lives of family members while providing no benefit to Larry Jones. Larry Jones respectfully requests removal of paragraph 17 from the report.

OFFENSE LEVEL COMPUTATION

As indicated earlier, Larry Jones is not denying that he had other narcotics transactions. The amounts attributed are overstated. There are no records. Larry Jones would suggest that the court use the amount of the drugs in the indictment which according to the government is 178 grams of heroin. In addition, pursuant to paragraphs e and f on pages 12-13 of the plea agreement, Larry Jones would suggest that all the defendants were equally capable. No one was in charge, the boss or a leader. This was a situation of

three people working together to sell heroin. This designation of "leader" or "supervisor" will make Larry Jones ineligible for BOP programs he needs for rehabilitation.

It is respectfully requested that this Court impose the following sentence in this matter in light of the Section 3553 factors and the totality of the circumstances of this case:

A term of imprisonment of 5 years followed by 4 years of supervised release. This is more than twice the prison term of co-defendant Marsha Fountain who received a prison term of 20 months followed by 1 year of supervised release. This term will allow for significant punishment, deterrence for Larry Jones as well as general deterrence. It will provide Larry Jones with the structure and opportunity to pursue his educational goals. He must learn to read and write. Larry Jones has been on home incarceration since June 25, 2020 without any violations. A five-year imprisonment sentence gives him credit for the home incarceration. In addition, since his guilty plea on January 19, 2023, Larry Jones has been in custody at the Jerome Combs Detention Center of Kankakee County. There are no educational programs available to him there and very limited recreation. Generally, there are no outdoor activities. Also, we would respectfully request that the court recommend that Larry Jones be allowed to

App. 44

participate in the BOP Residential Drug Abuse Program to address his
alcohol and drug use issues.    Finally, it is respectfully requested that the
court recommend that the BOP designate Larry Jones to a facility where he
can have access to educational programs and training in a trade.

                        Respectfully submitted,
                        Phillip A. Turner
                        Phillip A. Turner
                        Attorney for defendant
                        20 North Clark Street
                        Suite 3300
                        Chicago, Illinois 60602
                        312-899-0009
                        pturner98@sbcglobal.net

App. 45

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that in accordance with Fed.R.Civ.P.5, LR 5.5 and the General Order on Electronic Case Filing (ECF), the following document:

### LARRY JONES'S SENTENCING MEMORANDUM

was served pursuant to the district court's ECF system as to ECF filers.

Respectfully submitted,

Phillip A. Turner
Phillip A. Turner
Attorney for defendant
20 North Clark Street
Suite 3300
Chicago, Illinois 60602
312-899-0009
pturner98@sbcglobal.net

UNITED STATES OF AMERICA
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA | No. 20 CR 309-1 |
| v. | |
| LARRY JONES<br>also known as "Lil Larry" | Hon. Virginia M. Kendall |

## GOVERNMENT'S SENTENCING MEMORANDUM

Since at least 2016, LARRY JONES, a member of the Black P Stone Nation street gang, flooded the streets of Chicago with dangerous and illicit drugs, including cocaine, cocaine base, heroin, and fentanyl. JONES not only personally distributed these deadly drugs to his customers, he employed and worked with others—including co-defendants Jamar Spencer and Marsha Fountain—to cut, package, and sell drugs on his behalf. And as explained in greater detail below, JONES's drug trafficking enterprise had violent and sometimes fatal consequences. For these reasons, the government respectfully requests that the Court impose a within-Guidelines sentence of 188 months' imprisonment followed by four years of supervised release, which is sufficient but not greater than necessary to comply with the purposes set forth in 18 U.S.C. § 3553(a).

## I.  BACKGROUND

On June 24, 2020, defendant was charged by indictment with eight counts of conspiracy to distribute and distribution of heroin (Counts One, Two, and Four through Nine) and one count of money laundering (Count Three). Dkt. 1. Defendant

was arrested on June 25, 2020, and arraigned on the same day. Dkt. 13. Defendant was released on bond on or about July 2, 2020. Dkt. 21.

On January 19, 2023, defendant pled guilty to Count One, which charged him with conspiracy to distribute heroin, in violation of 21 U.S.C. § 846, and Count Three, which charged him with money laundering, in violation of 18 U.S.C. § 1956(a)(3)(A) . Dkts. 173, 174.

## II.    OFFENSE AND RELEVANT CONDUCT

Beginning on or about August 6, 2018, and continuing until on or about September 3, 2019, defendant conspired with co-defendants Jamar Spencer and Marsha Fountain, and others, to knowingly and intentionally possess with intent to distribute and distribute heroin. Specifically, between approximately August 2018 and September 2019, defendant worked with Fountain, Spencer, and others to sell quantities of heroin in and around Chicago. During this time, defendant directed Fountain to, among other things, store wholesale quantities of heroin, transport heroin to defendant and his associates, collect narcotics proceeds from Spencer and others who sold heroin supplied by defendant, and provide defendant with information she received from street level sellers and customers about the quality of the heroin that defendant supplied.

For example, on or about August 6, 2018, defendant placed a call to Fountain and asked her to bring him approximately 25 grams of heroin for defendant to sell to a customer who, unbeknownst to defendant and Fountain, was a confidential source ("CS") cooperating with law enforcement. Later that day, Fountain met with defendant and the CS in a vehicle parked on the 400 block of South Cicero Avenue in

2

Chicago. During that meeting, defendant cautioned Fountain about the presence of law enforcement in the area and asked Fountain if she brought "25 or 50" grams of heroin to the meeting. Fountain responded that she brought "25," which defendant understood to mean 25 grams of heroin. Fountain then handed a knotted plastic bag containing approximately 25 grams of heroin to defendant, and defendant then gave the heroin to the CS in exchange for $3,750. As discussed further below, $1,875 of the $3,750 paid by the CS to defendant was repayment for approximately 25 grams of heroin that defendant "fronted" to the CS on or about July 23, 2018.

During this same time period, defendant also sold quantities of heroin to Spencer that Spencer then sold to street-level customers. At defendant's sentencing hearing, we expect Spencer to testify that, between approximately October 2018 and April 2019, defendant sold 25-gram quantities to Spencer.[1] The 25-gram quantities of heroin that defendant sold to Spencer came in pre-packaged "bundles" containing approximately 14 or 15 "packs," with each pack containing a personal use quantity of heroin (approximately .1 grams). After defendant sold these bundles to Spencer, Spencer distributed that heroin at two drug spots controlled by defendant in the

---

[1] The government expects to call two witnesses—co-defendant Jamar Spencer and Dante Dockett—to testify at JONES's sentencing hearing. The government has provided *Giglio* and 3500 material for both witnesses, including reports of investigation for both witnesses, Dockett's grand jury transcript, and Dockett's trial testimony transcript from *United States v. Lee, et al.* 19 CR 641 (N.D. Ill.). On July 13, 2023, counsel for JONES filed a disclosure informing the Court that the government "declined to produce" pretrial sentence reports (PSR) for both Spencer and Dockett. Dkt. 195. First, JONES is not entitled Spencer and Dockett's PSRs because they do not contain *Brady* material. Second, and more importantly, the government is *prohibited* from disclosing the PSRs to JONES. *See* L.R. 32.1(j) ("The report *shall not* be disclosed to any person or agency without the written permission of the sentencing judge.) (emphasis added).

3

Austin neighborhood of Chicago: (1) the area near North Latrobe Avenue and West Chicago Avenue; and (2) the area on West Huron Street between North Pine and North Lotus Avenue. At times, defendant also directed Spencer to meet with one of defendant's other associates (Individual A) to deliver heroin to or collect narcotics proceeds from Individual A on defendant's behalf.

In addition to selling heroin to Spencer, defendant also sometimes directed Spencer to distribute heroin directly to defendant's customers. For example, on October 24, 2018, defendant directed Spencer to travel to the 3800 block of West Lake Street in Chicago to meet with the CS. During that meeting, Spencer gave the CS approximately 24.8 grams of heroin and received approximately $1,880 in narcotics proceeds from the CS, which Spencer then gave to defendant.

In addition to the August 6 and October 24, 2018, transactions described above, defendant sold approximately 124.3 grams of heroin to the CS over the span of five transactions that occurred between August 2018 and September 2019. Specifically, on or about August 15, 2018, defendant distributed approximately 24.8 grams of heroin to the CS; on or about September 19, 2018, defendant distributed approximately 25 grams of heroin to the CS; on or about December 18, 2018, defendant distributed approximately 24.9 grams of heroin to the CS; on or about February 20, 2019, defendant distributed approximately 25 grams of heroin to the CS; and on or about September 3, 2019, defendant distributed approximately 24.5 grams of heroin to the CS. Defendant received $9,385 in connection with those transactions.

4

In addition to the transactions charged in the indictment, we expect that Spencer will testify about his history with defendant and narcotics transactions with defendant that started in approximately 2016. We expect Spencer will testify that, in total, defendant possessed with intent to distribute and distributed at least 85 grams of cocaine base; at least 160 grams of fentanyl-laced heroin; more than 5 kilograms of heroin; and approximately 12 kilograms of marijuana.

Aside from the staggering amount of narcotics possessed and sold by defendant over the course of the conspiracy, defendant also laundered money as part of his drug trafficking enterprise. Specifically, on August 6, 2018, during the narcotics transaction between the CS and defendant described above, defendant received approximately $3,750 in payment from the CS. Approximately $1,875 of that total represented payment to defendant for narcotics previously supplied by defendant to the CS on or about July 23, 2018. Defendant accepted payment for the purpose of promoting and maintaining his drug dealing relationship with the CS.

## III. GUIDELINES CALCULATIONS

The government agrees with Probation's calculation of the applicable Guidelines: total offense level of 31, criminal history category IV, which results in an advisory Guidelines range of 151 to 188 months' imprisonment.

*Offense Level*

The government agrees with Probation that the base offense level is 32, pursuant to Guidelines § 2D1.1(a)(5), because the offense of conviction and relevant conduct involved more than 3,000 kilograms, but less than 10,000 kilograms, of converted drug weight. Probation also correctly applied a two-level enhancement to

5

App. 51

account for defendant's leadership role in the drug enterprise, resulting in a total offense level of 34.[2] Moreover, defendant has clearly accepted responsibility for the offense of conviction. Defendant has also admitted that, prior to the offense of conviction, he engaged in other narcotics trafficking offenses with co-defendant Spencer. However, defendant has maintained that Spencer—and by extension, the government—has overstated the quantity of narcotics trafficked by defendant and Spencer during the relevant time period. Nevertheless, if the Court finds that defendant has accepted responsibility, he is entitled to a three-level reduction, resulting in a total offense level of 31.

*Criminal History*

With respect to defendant's criminal history, the plea agreement anticipated that defendant would be assessed 0 criminal history points, resulting in a criminal history category of I, based, in large part, on the age of defendant's prior convictions. However, with the benefit of the PSR and additional records located by the Probation Officer, the government agrees that defendant's criminal history points actually equal seven, resulting in a criminal history category of IV.

Specifically, the plea agreement did not include the following convictions: defendant's 1997 attempted murder conviction in the Circuit Court of Cook County possession of a controlled substance offense in the Circuit Court of Cook County (PSR ¶ 40); and defendant's 2002 possession of a controlled substance conviction in the

---

[2] Because Counts One and Three are grouped together for guideline calculation purposes, the two-level enhancement applied by the government in the plea agreement, which brought the offense level to 36, should be disregarded. PSR ¶ 20.

Circuit Court of Cook County (PSR ¶ 43). As set forth in the PSR, defendant receives seven criminal history points for these convictions.

Accordingly, it is the government's position that based on a total offense level of 31 (assuming acceptance credit is granted) and criminal history category of IV, the applicable Guidelines range is 151 to 188 months' imprisonment.

## IV.  THE § 3553 FACTORS SUPPORT WITHIN-GUIDELINES SENTENCE OF 188 MONTHS' IMPRISONMENT

Criminal sentencing has four purposes – retribution, deterrence, incapacitation, and rehabilitation. *United States v. Milbourn*, 600 F.3d 808, 812 (7th Cir. 2010). Section 3553(a) requires the court to impose a sentence that is "sufficient, but not greater than necessary," to comply with the purposes of sentencing. In order to determine the particular sentence to impose, the Court must consider the familiar statutory factors listed in § 3553(a)(1)-(7). One of those factors is the advisory range set by the Sentencing Guidelines, and another is the Commission's policy statements. *See* § 3553(a)(4), (a)(5). Although the Sentencing Guidelines are advisory only, "[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 522 U.S. 38, 128 S. Ct. 586, 596 (2007). For two reasons, this Court should give serious consideration to the advisory Guidelines range.

*First*, the Sentencing Guidelines are the sole factor in § 3553(a) that provides any objective sentencing range that can practicably promote the overall goal of minimizing unwarranted sentencing disparities, which is itself a statutorily-mandated factor, § 3553(a)(6). *See United States v. Mykytiuk*, 415 F.3d 606, 608 (7th

7

Cir. 2005) ("The Guidelines remain an essential tool in creating a fair and uniform sentencing regime across the country."); *see also Booker v. United States*, 543 U.S. 220, 250 (2005) ("Congress' basic statutory goal – a system that diminishes sentencing disparity"); *id.* at 253 ("Congress' basic goal in passing the Sentencing Act was to move the sentencing system in the direction of increased uniformity"); *id.* at 267 (rejecting other remedial alternatives because they were inconsistent with the "basic objective of promoting uniformity in sentencing"). The Supreme Court created the advisory system to "continue to move sentencing in Congress' preferred direction, helping to avoid excessive sentencing disparities while maintaining flexibility sufficient to individual sentences where necessary." *Booker*, 543 U.S. at 264-65. The only way to prevent widespread unwarranted disparities is to give serious weight to the Guidelines.

*Second*, the Guidelines deserve meaningful consideration because they are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions." *Gall*, 128 S. Ct. at 594. It is true that there is no "presumption" that a Guidelines sentence is the "correct" sentence, *Rita v. United States*, 551 U.S. 338, 351 (2007), and that there is "broad" sentencing discretion post-*Booker*. *United States v. Demaree*, 459 F.3d 791, 794-95 (7th Cir. 2006). However, the Commission is "a respected public body with access to the best knowledge and practices of penology; its judgments should not lightly be disregarded." *United States v. Wachowiak*, 496 F.3d 744, 753 (7th Cir. 2007) (internal quotation and citation omitted). Furthermore, the Commission is charged by statute

8

to periodically review and revise the Guidelines as the Commission collects comments and data from numerous sources in the criminal justice system. *See* 28 U.S.C. § 994(o). These ongoing efforts to refine the Guidelines are another reason seriously to consider the advisory range.

Here, a careful consideration of the § 3553(a) factors weigh in favor of a 188-month sentence, the high end of the applicable Guidelines range.

## A. The Seriousness of the Offense and the History and Characteristics of the Defendant

The nature and circumstances of defendant's offense conduct is incredibly serious. The Court is well aware of the dangers of narcotics on individual users, their families and their communities. In short, drug use and addiction are causing the deterioration of whole neighborhoods in Chicago, and the narcotics distribution business brings consequences beyond the narcotics themselves, including the increase in violence and homicides in many of the district's communities. As explained in more detail below, defendant's drug trafficking activities contributed to the violence on the west side of Chicago.

As noted in the PSR, defendant is a member of the Black P Stone Nation street gang. PSR ¶ 10. Although defendant disagrees with that designation, testimony from co-defendant Spencer (a fellow Black P Stone) and Dante Dockett will dispel any doubt from the Court. We expect that Dockett will testify that he has known defendant for almost his entire life and knew defendant to be a drug dealer and member of the Black P Stones. Dockett will also testify that, although defendant was

9

a Black P Stone and Dockett a Traveling Vice Lord, Dockett occasionally purchased quantities of heroin and crack cocaine from defendant starting sometime in 2016.

The government expects that Dockett will testify about an instance in which defendant confided in Dockett in or around December 2016, he suspected that two young members of the Traveling Vice Lords—later identified as Derrick Jones and Stephen Tucker—robbed a stash house where defendant kept some of his contraband. Because Dockett was an elder member of the same gang as Jones and Tucker, he attempted to help defendant retrieve some of his property. However, Jones and Tucker refused to speak with Dockett and return defendant's property. As a result, Dockett murdered them both. *See United State v. Lee, et al.*, 19 CR 641 (N.D. Ill.), Dkt. 475 (Dockett Plea) at 9-10.[3] A senseless and callous act of violence carried out by Dockett and made possible by defendant's drug trafficking activities.

In addition to the murders of Jones and Tucker in December 2016, the government also expects that Dockett will testify about a murder stemming from defendant's drug trafficking activities that occurred in February 2017. Specifically, we expect Dockett will testify that in February 2017, defendant called Dockett and asked Dockett to participate in a drug transaction—either by delivering drugs or picking up drug money—with another of defendant's drug trafficking associates, Individual TB. When Individual TB and Dockett arrived at their destination, Individual TB exited the car with a loaded weapon and fired several shots. A short time later, Dockett drove to where Individual TB was located and saw Individual TB

---

[3] JONES is referenced in the plea agreement as "Individual LJ."

fighting with an individual later identified as Antoine Watkins. Individual TB and Dockett then worked together to murder Watkins. *See United State v. Lee, et al.*, 19 CR 641 (N.D. Ill.), Dkt. 475 (Dockett Plea) at 13-16. We expect that Dockett will testify that Individual TB called defendant shortly after the encounter with Watkins and explained the situation. Defendant then directed Dockett to follow Individual TB to make sure Individual TB was able to make it home without being stopped by police.

The sprawling nature of defendant's drug trafficking enterprise here is evidenced by the multiple transactions charged in this case (to which defendant admitted), by the expected testimony of co-defendant Spencer, and are corroborated by testimony already provided by Dockett. And the seriousness of defendant's drug trafficking crimes cannot be overstated. Although not charged with any violent acts in this particular case, defendant's proximity to—and tacit approval of—violence is disturbing and must be accounted for in his sentence. At least three people are dead, and their deaths can be traced directly to defendant's drug trafficking. A within-Guidelines sentence of 188 months' imprisonment is appropriate, but not greater than necessary, to adequately account for the seriousness of the offense and the seriousness of defendant's criminality.

## B.    The Need to Protect the Public and for General Deterrence

At 42 years old, defendant has not aged out of criminality. Defendant needs to be incapacitated for a significant period of time to protect the community from further harm. Defendant's prior sentences and his proximity to violence has done nothing to

11

deter defendant from engaging in his criminal lifestyle. Defendant's history and conduct in this case show that he is unlikely to be adequately deterred from future criminal conduct by a below-Guidelines sentence—let alone a five-year sentence—from this Court. Rather, a significant sentence, one at the high end of the Guidelines, will be sufficient but not greater than necessary in order to protect the public from defendant's disdain for, and inability to abide by, the rule of law. In addition, a 188-month sentence will promote respect for the law by sending a clear message that those who seek to distribute deadly narcotics and be complicit in violent behavior in furtherance of those drug trafficking crimes will be held to account for their conduct.

## V. CONDITIONS OF SUPERVISED RELEASE

Supervised release is extremely important in this case. The government agrees with all of the mandatory and discretionary and special conditions of supervised release recommended by Probation. All of these conditions should be imposed on the basis that they will facilitate supervision by the probation officer, promote defendant's respect for the law, and deter him from committing future crimes. Lastly, the conditions will support defendant's rehabilitation and reintegration into the community, ensure that he is engaged in lawful pursuits upon release from prison, in light of defendant's history and characteristics.

## VI.    CONCLUSION

Based on the foregoing, the government respectfully requests that this Court

sentence defendant to 188 months' imprisonment and 4 years of supervised release.

Respectfully submitted,

MORRIS PASQUAL
Acting United States Attorney

By:    s/ *Jimmy L. Arce*
JIMMY L. ARCE
JOHN D. MITCHELL
Assistant United States Attorneys
219 South Dearborn Street
Chicago, IL 60604
(312) 353-8449

Dated: July 13, 2023

13

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

UNITED STATES OF AMERICA  )
                               )
     V.                    )     20 CR 309-1
                               )     Judge Virginia M. Kendall
LARRY JONES,          )

### OBJECTION TO THE FILING AND COSIDERATION OF THE GOVERNMENT'S SENTENCING MEMORANDUM

Defendant Larry Jones, by his attorney Phillip A. Turner, respectfully submits the following as his objection to the filing and consideration of the government's sentencing memorandum, which was filed on July 13, 2023, at 9:54 pm:

1. Defendant Jones pleaded guilty on January 19, 2023, and this Court ordered that the government and defendant file their respective sentencing memoranda on April 7, 2023.

2. Pursuant to this Court's order, defendant Jones filed his sentencing memorandum on April 7, 2023. Docket #184. The government filed nothing.

3. On July 13, 2023, three months after the court ordered filing date, the government filed its sentencing memorandum. The government did not file a motion for leave to file its sentencing memorandum stating good cause as to why the government believes that the government has good cause to file

1

its sentencing memorandum three months late. The government filed its memorandum six days prior to the sentencing hearing scheduled for July 19, 2023. The government's sentencing memorandum makes allegations of uncharged conduct regarding drug transactions and defendant's involvement in a murder. Defendant does not want to wait to make this objection at the sentencing hearing in order to conserve the court's time.

Wherefore, defendant Jones objects to the filing and consideration of the government's sentencing memorandum.

Respectfully submitted,
/s/ Phillip A. Turner
Phillip A. Turner
Attorney for defendant
20 North Clark Street
Suite 3300
Chicago, Illinois 60602
312-899-0009
pturner98@sbcglobal.net

2

App. 61

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that the following document:

## OBJECTION TO THE FILING AND COSIDERATION OF THE GOVERNMENT'S SENTENCING MEMORANDUM

was served in accordance with Fed.R.Crim.P. 49, and L.R.5.5, and the

General Order on Electronic case Filing (ECF) pursuant to the district

court's system as ECF filers.

Respectfully submitted,

/s/ Phillip A. Turner
Phillip A. Turner
Attorney for defendant
20 North Clark Street
Suite 3300
Chicago, Illinois 60602
312-899-0009
pturner98@sbcglobal.net

3

1    for a living.  Doing it in such a fashion is appropriate.  And
2    as your Honor saw in the draft plea agreement, though he didn't
3    have to, Jamar Spencer put all of this drug weight on himself
4    because he fully cooperated with the government and he fully
5    acknowledged his conduct.  Instead of taking responsibility
6    just for the seven or so transactions that are outlined in the
7    four corners of the indictment, he's walking through all of
8    these drug transactions.  And so Jamar Spencer wasn't all over
9    the place.  He was lucid.  He testified, in the government's
10   position, credibly about these regular transactions, both in
11   terms of quantities and in types of drugs that he transacted
12   with Dante Dockett -- or with Larry Jones, which was
13   corroborated by Dante Dockett having conducted similar
14   narcotics transactions.

15        So I just wanted to note that in terms of Jamar
16   Spencer's testimony and whether these are guesstimates.  This
17   is a normal, acceptable way to sort of calculate drug
18   quantities in these types of cases, so I just wanted to note
19   that.

20        THE COURT:  Okay.  So, normally, it is a situation
21   where this dispute might come forward without any type of
22   evidence to support it, and then I have a much more difficult
23   situation; but here I had the testimony of two individuals,
24   Mr. Spencer and Mr. Dockett, who testified regarding their own
25   criminal activity and the criminal activity that they engaged

1    in with the defendant.

2        I did not find that Mr. Spencer's testimony was in any

3    way clouded by his drug or alcohol use.  He was lucid in his

4    recollections.  He never really on cross-examination admitted

5    to having any problem with recalling these events or telling

6    the government about the different sales that he had done or

7    the different sources of his sales.  His testimony alone I

8    think gives you the 32 with the heroin.  So you -- so certainly

9    his interaction with the defendant would bring you to that

10    level 32.

11        But then he's also corroborated by Mr. Dockett as

12    well.  Certainly, when we look at Mr. Dockett, it's quite

13    disturbing to hear of an individual who has murdered six people

14    in his lifetime.  And you have to wonder about his motivation,

15    but his motivation was also given to you in the form of his own

16    admission to his own activity, which was candid and

17    straightforward.  And I did not think on cross-examination that

18    there was any concerns about his recall.

19        And so with the corroboration of those two individuals

20    who I found to be credible and not really touched on cross by

21    the cross-examination, I do think the drug quantity was

22    appropriate.  In fact, I think it's under-represented.  I think

23    it's under-represented by what was said based upon the ongoing

24    interaction that these men had with the defendant.  Probably,

25    if we dug into it more, it would even go higher.  But certainly

1   it is supported by the testimony and by the plea agreement and

2   even by the defendant's own admission that there were other

3   amounts.  So we don't know what those other amounts were, but

4   we found out yesterday and today from these two men.

5           So 32 will be the base offense level.

6           And now we'll turn to this issue -- is there an

7   objection on role in the offense?

8           MR. ARCY:  I believe so.

9           THE COURT:  Right.

10          MR. ARCY:  In the calculation that we received from

11  defense counsel yesterday, I don't think it included the

12  two-level enhancement for role in the offense.

13          THE COURT:  Okay.  So you want to argue against that.

14  Go right ahead now, Mr. Turner.

15          MR. TURNER:  Yes, Judge.

16          I think, as I said in my sentencing memo, that's where

17  I had an objection to the role, that all of these people were

18  working together.  There was no hierarchy.  And as I said

19  before, I attached the government's sentencing memo for

20  Ms. Fountain and -- where the government said that she brought

21  drugs, she brought mix, she knew how to mix it, and all these

22  things.  This wasn't some drug trafficking organization where,

23  you know, someone was at the head and -- Larry Jones was at the

24  head.  They were all working together.  I mean, it was -- I

25  guess if you want to characterize it in some way, it was a

App. 65

1     they said -- or not that -- as much.  And I think there's a lot

2     of gray there because, as I indicated before, lots of --

3     several people had drugs here.  Marsha Fountain was bringing

4     drugs and things like that.  And I think it's very easy for

5     these things to get put on various people or -- when, really,

6     that's not their -- their responsibility.

7            But certainly Larry Jones took responsibility.  He

8     pled guilty.  The Court pointed to admissions that he made in

9     making the finding about leadership role and supervision.  And

10    he made those admissions.

11           So if it counts one way, I don't see how it can't

12    count in the other way or always count against him.  So he

13    admitted his conduct.  He admitted the conduct with which he

14    was charged.  And that's a basic tenet, I think, of our law,

15    that people are charged with something and they can either

16    admit it or they're entitled under our Constitution to go to

17    trial and contest it.  He didn't do that.  He admitted that

18    what he was charged with he did.  Now, things that aren't even

19    charged, I don't think we should be discussing those because

20    that's not part of acceptance of responsibility.  And in

21    Mr. Jones' case, though, as I said, he admitted the charged

22    conduct, and he admitted that, yes, I had other drug dealings

23    with them.  It wasn't the first time.  There's all kinds of

24    things.

25           So I think he's entitled to acceptance of

1    responsibility because he has accepted responsibility.  And,

2    certainly, as I think I indicated yesterday or one of the other

3    days, I mean, he -- he never was indicating he was going to

4    trial or anything like that, so the government was never

5    required to prepare anything.

6          So I think under the circumstances here, this case,

7    and even with the advisory guidelines, advisory as they are,

8    he's entitled to acceptance of responsibility, all three of the

9    points.

10          THE COURT:  Well, it's a rather close call in my book

11    based upon the minimization that he has done regarding his role

12    in the gang as well as his activity both dealing drugs and in

13    violence.  So I think it's a closer call, yet there's a

14    constitutional right for the defendant to make the government

15    put its proof on, and they did that today.  I think it would be

16    improper for me to suggest that he's required to admit to the

17    relevant conduct that they put on the stand today, although I

18    do think he's close in his minimization of that conduct.  I'm

19    going to give him the acceptance of responsibility points for

20    pleading guilty to what was charged, and, of course, preventing

21    you from having to put it on at trial, so it saved the

22    government resources there, and we'll discuss his overarching,

23    shall we say, mental state with the activity in the 3553

24    factors.

25          So, therefore, looking at the sentencing guideline

1   here.  Stay here for the sentence.  Okay.

2           All right.  So we start out with the sentencing, as I

3   mentioned, with an advisory guideline range of 151 to 188

4   months.

5           And then I turn to the 3553 factors.  And we begin

6   first with the seriousness of the offense.

7           Well, I can't -- I can't underestimate the seriousness

8   of the drug problem that is occurring on the west side of the

9   city.  Austin is always struggling, struggling to try to help

10  its children, to try to keep a safe community, but the streets

11  are filled with the drug dealers that are talking about their

12  blocks and their share and their drugs, and it brings violence

13  to the community.  It causes people to stay inside their

14  houses.  It causes children not to be safe.  And the drugs that

15  are being placed, especially the heroin is the most highly

16  addictive drug, and that drug, it takes people away from being

17  parents, like your own mother.  Right?

18           THE DEFENDANT:  Yes.

19           THE COURT:  They can't be -- they can't be parents.

20  They don't know how to do anything but get that drug and get

21  that next hit.  It robs children of their parents.  It robs

22  employers of employees.  It robs leadership for our children

23  who need guidance.  And, sadly, the Austin community where you

24  were doing your drug dealing, that community suffers from

25  violence and drug dealing at a greater degree than other areas

1    of our city.  And it's sad because it just tries so hard to
2    remove itself from that, but it cannot because of the
3    seriousness of these drugs that are constantly being pumped
4    into the community.  So it's an extremely serious offense.

5            History and characteristics of you.  You sure had a
6    bum rap, not having leadership in the form of your parents, and
7    that shows.  It shows through a juvenile record that I'm not
8    even taking into account at all, but then it comes forward as
9    you start to age and get into teenage years and into your
10    adulthood.

11            The problem here is just a repeated pattern of
12    conduct:  Drug offense, a disorderly conduct, armed robbery
13    when you were younger, attempted murder with these shootings.
14    It's filled with probation violations, disciplinary violations,
15    supervised release violations, even violations while you're
16    incarcerated, disciplinary incidents and violations of the
17    rules.  And I wonder if, at the age of 16, if the state system
18    would have done a better job, too, because here you pled guilty
19    and you were found guilty of that attempted murder, and you got
20    an eight-year sentence.  You got nine years originally in 1998,
21    and then it was amended to eight years, and you were released
22    in 2001, so three years, four years, after the sentence was
23    given.  You're released, put on supervised release, violate,
24    and go back into custody.

25            So then the next one that you get is the possession of

1    a controlled substance when you're a young man, selling rocks
2    on the street, and you're found guilty.  You get two years of
3    custody on February 18th of 2003, and you're released on
4    supervised release three months later in May and discharged
5    that day from supervised release.  So I'm not sure how that
6    happened, but obviously -- were you in custody at the time?
7            THE DEFENDANT:  I actually did nine months for that
8    case.
9            THE COURT:  The name of the case?
10           THE DEFENDANT:  No, I said I did nine months for that
11   case.
12           THE COURT:  Nine months.
13           THE DEFENDANT:  Yeah.
14           THE COURT:  Nine months for selling, right?
15           THE DEFENDANT:  Yes.
16           THE COURT:  Right.  So all in all, you've done four
17   years and nine months for the convictions, right?
18           THE DEFENDANT:  That's correct.
19           THE COURT:  So to your argument of if they had five
20   years here or five years there or five years here, well, he's
21   getting sentences that are warning signs of what could be to
22   come before he reaches this.  So I see that you need specific
23   deterrence.  I see that there's a pattern of behavior of
24   violating court orders and orders when you're on release.
25           And then the thing that worries me the most is the

1   minimization of your role in the broader picture of these
2   offenses.  No one is holding you responsible for attempted
3   murder.  No one is holding you -- or the murder of Meem [sic.],
4   of Watkins.  No one is holding you responsible for beating
5   Cash.  But what really is indicative of someone who is going to
6   turn away from a criminal path is someone who accepts his role
7   in all of these offenses in such a way that he says, "I'm
8   closing this door and moving forward."  Those are serious,
9   serious violations of the law that were done to benefit you,
10  according to testimony, done to enable you to continue on with
11  your work.

12          You can't compare yourself to Ms. Fountain.
13  Ms. Fountain was a low-level worker.  She wasn't a gang member.
14  She wasn't someone who was directing others on the street.  She
15  didn't have blocks that were her blocks.  She was being
16  directed.  So there's no comparison in the situation for
17  avoiding unwarranted sentencing disparities.

18          So what I see here is an individual who not only has
19  engaged in this drug trafficking organization, but is
20  minimizing his role, not admitting that there was any gang
21  involvement, yet two people saw you sitting at the table or at
22  the meetings for the gang.  Someone knows that you were a
23  General in the gang.  Others have seen you participating as a
24  gang member.  And to just minimize that and say, "That's not
25  accurate," to minimize that, "I don't do any violence," when I

 1 │ have two individuals testifying under oath that there were
 2 │ these violent acts that were at your direction, minimizing that
 3 │ you don't have any violence involved in your crime when there's
 4 │ even an undercover potential transfer of a weapon that you were
 5 │ going to provide for the undercover.  That minimization shows
 6 │ that you need specific deterrence and that you may commit
 7 │ crimes in the future because you haven't quite accepted the
 8 │ full level of the conduct that you've engaged in as a young
 9 │ man.

10 │          Now, when I look to the issue of general deterrence
11 │ and promoting respect for the rule of law, that's looking out
12 │ into the community.  That's where the community says, "I need
13 │ this sentence to reflect the seriousness of what he has done."
14 │ And those in the community deserve individuals to be locked up
15 │ that are committing this kind of crime on their streets.  They
16 │ deserve sentences that ensure that that behavior is sanctioned.
17 │ And without it, without that, they feel fear.  Without that,
18 │ they feel despair.  They feel that there's no way to continue
19 │ on.  The rule of law has to say:  We understand that when
20 │ someone is engaged in this level of dealing, when they're
21 │ dealing with the guys that testified here, when they're in the
22 │ gangs that was testified regarding here, when they're doing
23 │ violent acts like this, we must give a sentence that says you
24 │ will stop and we recognize it's serious because you're hurting
25 │ our community, our community, the rule of law community.

1    And so what has -- what has most importance here is

2  sending a message that the rule of law will be protected when

3  we look at the activity that is laid out here.

4    So it is my sentence that you will serve 188 months'

5  incarceration, followed by five years of supervised release on

6  Count -- excuse me, four years of supervised release on

7  Count 1, three years of supervised release on Count 3.  That

8  will run concurrently.  No fine.  No restitution.  You owe $200

9  for the two special assessments.

10    And now I need to go through some of those conditions

11  of supervised release that you have that will -- that you'll

12  need to follow when you are released.

13    So when you're released, you have these conditions,

14  and I'm going to go through them now.

15    Hold on just a second.  Give me a second.  I moved

16  them aside.

17    Here they are.

18    You shall not commit another state or federal or local

19  crime.

20    You shall not unlawfully possess a controlled

21  substance.

22    And you shall cooperate in the collection of a DNA

23  sample if you're required by the law.

24    You shall refrain from any unlawful use of a

25  controlled substance.  And submit to one drug test within 15

# UNITED STATES DISTRICT COURT
## FOR THE Northern District of Illinois − CM/ECF NextGen 1.7.1.1
### Eastern Division

UNITED STATES OF AMERICA

                                    Plaintiff,

v.                                                      Case No.: 1:20−cr−00309
                                                        Honorable Virginia M. Kendall

Larry Jones, et al.

                                    Defendant.

---

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Thursday, July 20, 2023:

    MINUTE entry before the Honorable Virginia M. Kendall as to Larry Jones. Sentencing hearing held and concluded on 7/20/2023. Mailed notice (lk, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at *www.ilnd.uscourts.gov*.

# UNITED STATES DISTRICT COURT

Northern District of Illinois

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **JUDGMENT IN A CRIMINAL CASE** |
| v. | ) | |
| | ) | Case Number:    1:20-CR-00309(1) |
| LARRY JONES | ) | USM Number:    55044-424 |
| | ) | |
| | ) | Phillip Arnold Turner |
| | ) | Defendant's Attorney |

## THE DEFENDANT:

☒ pleaded guilty to count(s) 1 and 3 of the Indictment.

☐ pleaded nolo contendere to count(s)     which was accepted by the court.

☐ was found guilty on count(s)     after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| **Title & Section / Nature of Offense** | **Offense Ended** | **Count** |
|---|---|---|
| 21:846=Cd.F Conspiracy To Distribute Controlled Substance | 09/03/2019 | 1 |
| 18:1956-3300.F Money Laundering - Interstate Commerce | 09/03/2019 | 3 |

The defendant is sentenced as provided in pages 2 through 8 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s)

☒ Count(s) remaining are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States Attorney for this District within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States Attorney of material changes in economic circumstances.

July 20, 2023
Date of Imposition of Judgment

Signature of Judge
Virginia M. Kendall, United States District Judge

Name and Title of Judge

7/25/2023
Date

App. 75

ILND 245B (Rev. 03/12/2020) Judgment in a Criminal Case
Sheet 2 – Imprisonment

Judgment – Page 2 of 8

DEFENDANT: LARRY JONES
CASE NUMBER: 1:20-CR-00309(1)

# IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:
One hundred eighty eight (188) months as to count 1 of the Indictment; one hundred eitghty eight (188) months as to count 3 of the Indictment. Terms to run concurrent for a total of one hundred eighty eight (188) months.

☒ The court makes the following recommendations to the Bureau of Prisons: that the defendant participate in the Residential Drug and Alcohol Treatment Program (RDAP) while incarcerated; that the defendant be incarcerated at a facility with ample educational programs that is located close to Chicago, Illinois.

☒ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

    ☐ at     on

  ☐ as notified by the United States Marshal.

  ☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐ before 2:00 pm on

    ☐ as notified by the United States Marshal.

    ☐ as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows: _____

_____

_____

Defendant delivered on _____ to _____ at_____ , with a certified copy of this judgment.

_____

UNITED STATES MARSHAL

By _____

DEPUTY UNITED STATES MARSHAL

App. 76

ILND 245B (Rev. 03/12/2020) Judgment in a Criminal Case
Sheet 3 – Supervised Release

Judgment – Page 3 of 8

DEFENDANT: LARRY JONES
CASE NUMBER: 1:20-CR-00309(1)

## MANDATORY CONDITIONS OF SUPERVISED RELEASE PURSUANT TO 18 U.S.C § 3583(d)

Upon release from imprisonment, you shall be on supervised release for a term of:
Four (4) years term as to count 1 of the Indictment; three (3) years as to count 3 of the Indictment. Terms are to run concurrent for a total of four (4) years.

The court imposes those conditions identified by checkmarks below:

**During the period of supervised release:**

- ☒ (1) you shall not commit another Federal, State, or local crime.
- ☒ (2) you shall not unlawfully possess a controlled substance.
- ☐ (3) you shall attend a public, private, or private nonprofit offender rehabilitation program that has been approved by the court, if an approved program is readily available within a 50-mile radius of your legal residence. [Use for a first conviction of a domestic violence crime, as defined in **§ 3561(b).**]
- ☐ (4) you shall register and comply with all requirements of the Sex Offender Registration and Notification Act (**42 U.S.C. § 16913**).
- ☒ (5) you shall cooperate in the collection of a DNA sample if the collection of such a sample is required by law.
- ☒ (6) you shall refrain from any unlawful use of a controlled substance AND submit to one drug test within 15 days of release on supervised release and at least two periodic tests thereafter, up to 104 periodic tests for use of a controlled substance during each year of supervised release. [This mandatory condition may be ameliorated or suspended by the court for any defendant if reliable sentencing information indicates a low risk of future substance abuse by the defendant.]

## DISCRETIONARY CONDITIONS OF SUPERVISED RELEASE PURSUANT TO 18 U.S.C § 3563(b) AND 18 U.S.C § 3583(d)

**Discretionary Conditions** — The court orders that you abide by the following conditions during the term of supervised release because such conditions are reasonably related to the factors set forth in **§ 3553(a)(1)** and **(a)(2)(B), (C), and (D);** such conditions involve only such deprivations of liberty or property as are reasonably necessary for the purposes indicated in **§ 3553 (a)(2) (B), (C), and (D);** and such conditions are consistent with any pertinent policy statement issued by the Sentencing Commission pursuant to **28 U.S.C. 994a.** The court imposes those conditions identified by checkmarks below:

**During the period of supervised release:**

- ☐ (1) you shall provide financial support to any dependents if you are financially able to do so.
- ☐ (2) you shall make restitution to a victim of the offense under **§ 3556** (but not subject to the limitation of **§ 3663(a)** or **§ 3663A(c)(1)(A)**).
- ☐ (3) you shall give to the victims of the offense notice pursuant to the provisions of **§ 3555**, as follows: ▭
- ☒ (4) you shall seek, and work conscientiously at, lawful employment or, if you are not gainfully employed, you shall pursue conscientiously a course of study or vocational training that will equip you for employment.
- ☐ (5) you shall refrain from engaging in the following occupation, business, or profession bearing a reasonably direct relationship to the conduct constituting the offense, or engage in the following specified occupation, business, or profession only to a stated degree or under stated circumstances; (if checked yes, please indicate restriction(s)) ▭.
- ☒ (6) you shall not knowingly meet or communicate with any person whom you know to be engaged, or planning to be engaged, in criminal activity and shall not:
  - ☐ visit the following type of places: ▭.
  - ☒ knowingly meet or communicate with the following persons: Jamar Spencer and Marsha Fountain.
- ☒ (7) you shall refrain from ☐ any or ☒ excessive use of alcohol (defined as ☒ having a blood alcohol concentration greater than 0.08; or ☐ ▭), and from any use of a narcotic drug or other controlled substance, as defined in **§ 102** of the Controlled Substances Act (**21 U.S.C. § 802**), without a prescription by a licensed medical practitioner.
- ☒ (8) you shall not possess a firearm, destructive device, or other dangerous weapon.
- ☒ (9) ☒ you shall participate, at the direction of a probation officer, in a substance abuse treatment program, which may include urine testing up to a maximum of 104 tests per year.
  - ☒ you shall participate, at the direction of a probation officer, in a mental health treatment program, and shall take any medications prescribed by the mental health treatment provider.
  - ☐ you shall participate, at the direction of a probation officer, in medical care; (if checked yes, please specify:

App. 77

DEFENDANT: LARRY JONES
CASE NUMBER: 1:20-CR-00309(1)

☐ (10) (intermittent confinement): you shall remain in the custody of the Bureau of Prisons during nights, weekends, or other intervals of time, totaling ▓ [no more than the lesser of one year or the term of imprisonment authorized for the offense], during the first year of the term of supervised release (provided, however, that a condition set forth in §3563(b)(10) shall be imposed only for a violation of a condition of supervised release in accordance with § 3583(e)(2) and only when facilities are available) for the following period ▓.

☐ (11) (community confinement): you shall reside at, or participate in the program of a community corrections facility (including a facility maintained or under contract to the Bureau of Prisons) for all or part of the term of supervised release, for a period of ▓ months.

☐ (12) you shall work in community service for ▓ hours as directed by a probation officer.

☐ (13) you shall reside in the following place or area: ▓, or refrain from residing in a specified place or area: ▓,

☒ (14) you shall not knowingly leave from the federal judicial district where you are being supervised, unless granted permission to leave by the court or a probation officer. The geographic area of the Northern District of Illinois currently consists of the Illinois counties of Cook, DuPage, Grundy, Kane, Kendall, Lake, LaSalle, Will, Boone, Carroll, DeKalb, Jo Daviess, Lee, McHenry, Ogle, Stephenson, Whiteside, and Winnebago.

☒ (15) you shall report to the probation office in the federal judicial district to which you are released within 72 hours of your release from imprisonment. You shall thereafter report to a probation officer at reasonable times as directed by the court or a probation officer.

☒ (16) ☒ you shall permit a probation officer to visit you ☒ at any reasonable time or ☐ as specified: ,
    ☒ at home    ☐ at work    ☐ at school    ☒ at a community service location
    ☒ other reasonable location specified by a probation officer
    ☒ you shall permit confiscation of any contraband observed in plain view of the probation officer.

☒ (17) you shall notify a probation officer within 72 hours, after becoming aware of any change in residence, employer, or workplace and, absent constitutional or other legal privilege, answer inquiries by a probation officer. You shall answer truthfully any inquiries by a probation officer, subject to any constitutional or other legal privilege.

☒ (18) you shall notify a probation officer within 72 hours if after being arrested, charged with a crime, or questioned by a law enforcement officer.

☐ (19) (home confinement)
    ☐ (a)(i) (home incarceration) for a period of __ months, you are restricted to your residence at all times except for medical necessities and court appearances or other activities specifically approved by the court.
    ☐ (a)(ii) (home detention) for a period of __ months, you are restricted to your residence at all times except for employment; education; religious services; medical, substance abuse, or mental health treatment; attorney visits; court appearances; court-ordered obligations; or other activities pre-approved by the probation officer.
    ☐ (a)(iii) (curfew) for a period of __ months, you are restricted to your residence every day.
    ☐ from the times directed by the probation officer; or ☐ from __ to __.
    ☐ (b) your compliance with this condition, as well as other court-imposed conditions of supervision, shall be monitored by a form of location monitoring technology selected at the discretion of the probation officer, and you shall abide by all technology requirements.
    ☐ (c) you shall pay all or part of the cost of the location monitoring, at the daily contractual rate, if you are financially able to do so.

☐ (20) you shall comply with the terms of any court order or order of an administrative process pursuant to the law of a State, the District of Columbia, or any other possession or territory of the United States, requiring payments by you for the support and maintenance of a child or of a child and the parent with whom the child is living.

☐ (21) (deportation): you shall be surrendered to a duly authorized official of the Homeland Security Department for a determination on the issue of deportability by the appropriate authority in accordance with the laws under the Immigration and Nationality Act and the established implementing regulations. If ordered deported, you shall not remain in or enter the United States without obtaining, in advance, the express written consent of the United States Attorney General or the United States Secretary of the Department of Homeland Security.

☒ (22) you shall satisfy such other special conditions as ordered below.

☒ (23) You shall submit your person, property, house, residence, vehicle, papers [computers (as defined in 18 U.S.C. 1030(e)(1)), other electronic communications or data storage devices or media,] or office, to a search conducted by a United States Probation Officer(s). Failure to submit to a search may be grounds for revocation of release. You shall warn any other occupants that the premises may be subject to searches pursuant to this condition. An officer(s) may conduct a search pursuant to this condition only when reasonable suspicion exists that you have violated a condition of your supervision and that the areas to be searched contain evidence of this violation. Any search must be conducted at a reasonable time and in a reasonable manner.

☐ (24) Other:

App. 78

Case: 23-2669 Document: 36 Filed: 07/25/23 Page: 5 of 8 PageID #:1143
Case: 1:20-cr-00309 Document #: 336 Filed: 03/23/2024 Page 5 of 8 Pages: 139
ILND 245B (Rev. 03/12/2020) Judgment in a Criminal Case
Sheet 3 – Supervised Release
Judgment – Page 5 of 8

DEFENDANT: LARRY JONES
CASE NUMBER: 1:20-CR-00309(1)

## SPECIAL CONDITIONS OF SUPERVISED RELEASE PURSUANT TO 18 U.S.C. 3563(b)(22) and 3583(d)

The court imposes those conditions identified by checkmarks below:

### During the term of supervised release:

☐ (1) if you have not obtained a high school diploma or equivalent, you shall participate in a General Educational Development (GED) preparation course and seek to obtain a GED within the first year of supervision.

☐ (2) you shall participate in an approved job skill-training program at the direction of a probation officer within the first 60 days of placement on supervision.

☒ (3) if unemployed after the first 60 days of supervision, the probation office shall notify the Court to determine course of action.

☐ (4) you shall not maintain employment where you have access to other individual's personal information, including, but not limited to, Social Security numbers and credit card numbers (or money) unless approved by a probation officer.

☒ (5) you shall not incur new credit charges or open additional lines of credit without the approval of a probation officer unless you are in compliance with the financial obligations imposed by this judgment.

☒ (6) you shall provide a probation officer with access to any requested financial information requested by the probation officer to monitor compliance with conditions of supervised release.

☒ (7) within 72 hours of any significant change in your economic circumstances that might affect your ability to pay restitution, fines, or special assessments, you must notify the probation officer of the change.

☐ (8) you shall file accurate income tax returns and pay all taxes, interest, and penalties as required by law.

☐ (9) you shall participate in a sex offender treatment program. The specific program and provider will be determined by a probation officer. You shall comply with all recommended treatment which may include psychological and physiological testing. You shall maintain use of all prescribed medications.

  ☐ You shall comply with the requirements of the Computer and Internet Monitoring Program as administered by the United States Probation Office. You shall consent to the installation of computer monitoring software on all identified computers to which you have access and to which the probation officer has legitimate access by right or consent. The software may restrict and/or record any and all activity on the computer, including the capture of keystrokes, application information, Internet use history, email correspondence, and chat conversations. A notice will be placed on the computer at the time of installation to warn others of the existence of the monitoring software. You shall not remove, tamper with, reverse engineer, or in any way circumvent the software.

  ☐ The cost of the monitoring shall be paid by you at the monthly contractual rate, if you are financially able, subject to satisfaction of other financial obligations imposed by this judgment.

  ☐ You shall not possess or use at any location (including your place of employment), any computer, external storage device, or any device with access to the Internet or any online computer service without the prior approval of a probation officer. This includes any Internet service provider, bulletin board system, or any other public or private network or email system

  ☐ You shall not possess any device that could be used for covert photography without the prior approval of a probation officer.

  ☐ You shall not view or possess child pornography. If the treatment provider determines that exposure to other sexually stimulating material may be detrimental to the treatment process, or that additional conditions are likely to assist the treatment process, such proposed conditions shall be promptly presented to the court, for a determination, pursuant to **18 U.S.C. § 3583(e)(2),** regarding whether to enlarge or otherwise modify the conditions of supervision to include conditions consistent with the recommendations of the treatment provider.

  ☐ You shall not, without the approval of a probation officer and treatment provider, engage in activities that will put you in unsupervised private contact with any person under the age of 18, and you shall not knowingly visit locations where persons under the age of 18 regularly congregate, including parks, schools, school bus stops, playgrounds, and childcare facilities. This condition does not apply to contact in the course of normal commercial business or unintentional incidental contact

  ☐ This condition does not apply to your family members:     [Names]

  ☐ Your employment shall be restricted to the judicial district and division where you reside or are supervised, unless approval is granted by a probation officer. Prior to accepting any form of employment, you shall seek the approval of a probation officer, in order to allow the probation officer the opportunity to assess the level of risk to the community you will pose if employed in a particular capacity. You shall not participate in any volunteer activity that may cause you to come into direct contact with children except under circumstances approved in advance by a probation officer and treatment provider.

  ☐ You shall provide the probation officer with copies of your telephone bills, all credit card statements/receipts, and any other financial information requested.

ILND 245B (Rev. 03/12/2020) Judgment in a Criminal Case

Sheet 3 – Supervised Release

Judgment – Page 6 of 8

DEFENDANT: LARRY JONES

CASE NUMBER: 1:20-CR-00309(1)

☐ You shall comply with all state and local laws pertaining to convicted sex offenders, including such laws that impose restrictions beyond those set forth in this order.

☒ (10) you shall pay to the Clerk of the Court any financial obligation ordered herein that remains unpaid at the commencement of the term of supervised release, at a rate of not less than 10% of the total of your gross earnings minus federal and state income tax withholdings.

☒ (11) you shall not enter into any agreement to act as an informer or special agent of a law enforcement agency without the prior permission of the court.

☒ (12) you shall pay to the Clerk of the Court $15,015, as repayment to the United States of government funds you received during the investigation of this offense. (The Clerk of the Court shall remit the funds to: Bureau of Alcohol, Tobacco, Firearms & Explosives, Attn: Budget Analyst, 175 West Jackson Boulevard, Suite 1500, Chicago, IL 60604.

☐ (13) if the probation officer determines that you pose a risk to another person (including an organization or members of the community), the probation officer may require you to tell the person about the risk, and you must comply with that instruction. Such notification could include advising the person about your record of arrests and convictions and substance use. The probation officer may contact the person and confirm that you have told the person about the risk.

☒ (14) You shall observe one Reentry Court session, as instructed by your probation officer.

☐ (15) Other:

ILND 245B (Rev. 03/12/2020) Judgment in a Criminal Case
Sheet 5 – Criminal Monetary Penalties

Judgment – Page 7 of 8

DEFENDANT: LARRY JONES
CASE NUMBER: 1:20-CR-00309(1)

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

|  | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| TOTALS | $200.00 | $.00 | $.00 | $.00 | $.00 |

☐ The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to **18 U.S.C. § 3664(i)**, all nonfederal victims must be paid before the United States is paid.

☐ Restitution amount ordered pursuant to plea agreement $_____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant **to 18 U.S.C. § 3612(f)**. All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to **18 U.S.C. § 3612(g)**.

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐ the interest requirement is waived for the _____ .

☐ the interest requirement for the _____ is modified as follows:

☐ The defendant's non-exempt assets, if any, are subject to immediate execution to satisfy any outstanding restitution or fine obligations.

\* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
\*\* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
\*\*\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

ILND 245B (Rev. 03/12/2020) Judgment in a Criminal Case
Sheet 7 - Denial of Federal Benefits

Judgment — Page 8 of 8

DEFENDANT: LARRY JONES
CASE NUMBER: 1:20-CR-00309(1)

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A**  ☒  Lump sum payment of $200.00 due immediately.

  ☐  balance due not later than     , or

  ☐  balance due in accordance with ☐ C, ☐ D, ☐ E, or ☐ F below; or

**B**  ☐  Payment to begin immediately (may be combined with ☐ C, ☐ D, or ☐ F below); or

**C**  ☐  Payment in equal     *(e.g. weekly, monthly, quarterly)* installments of $     over a period of     *(e.g. months or years)*, to commence     *(e.g., 30 or 60 days)* after the date of this judgment; or

**D**  ☐  Payment in equal     *(e.g. weekly, monthly, quarterly)* installments of $     over a period of     *(e.g. months or years)*, to commence     *(e.g., 30 or 60 days)* after release from imprisonment to a term of supervision; or

**E**  ☐  Payment during the term of supervised release will commence within     *(e.g. 30 or 60 days)* after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F**  ☐  Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several

| Case Number<br>Defendant and Co-Defendant Names<br>(including defendant number) | Total Amount | Joint and Several<br>Amount | Corresponding Payee, if<br>Appropriate |
|---|---|---|---|

**See above for Defendant and Co-Defendant Names and Case Numbers *(including defendant number)*, Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.**

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☐  The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.